UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re

AMTRUST FINANCIAL SERVICES, INC.
SECURITIES LITIGATION                                           17-cv-1545 (LAK)

This document applies to:                    All Cases

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

William John Geddish
Robert Daniel Gerson
Avital Orly Malina
Mark Tamerlane Millkey
David Avi Rosenfeld
Samuel Howard Rudman
ROBINS GELLER RUDMAN & DOWD LLP
*Attorneys for Lead Plaintiffs New England Carpenters*
*Guaranteed Annuity and Pension Funds and Lead Counsel*

Mark Adam Kirsch
Amy Rublin Mayer
Akiva Shapiro
Lawrence Jay Zwiefach
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Defendants AmTrust*
*Financial Services, Inc., Barry D. Zyskind,*
*Ronald E. Pipoly, Jr., Donald T. DeCarlo,*
*Susan C. Fisch, Abraham Gulkowitz,*
*George Karfunkel, Jay J. Miller,*

Jason Daniel Gerstein
Timothy E. Hoeffner
Lawrence A. Wojcik
MCDERMOTT WILL EMERY
*Attorneys for Defendant BDO USA, LLP*

Christopher Thomas Brown
Gregg L. Weiner
ROPES & GRAY LLP
*Attorneys for Defendants RBC Capital Markets, LLC, UBS*
*Securities LLC, CitiGroup Global Markets, Inc., Keefe,*
*Bruyette & Woods, Inc., Morgan Stanley & Co. LLC*

LEWIS A. KAPLAN, *District Judge.*

Plaintiffs bring this putative securities class action against AmTrust Financial

Services, Inc. ("AmTrust"), current and former officers and directors, its former auditor, and certain

underwriters of its securities. They claim that certain public filings and statements made by

defendants contain misstatements of material facts in violation of Sections 11, 12(a), and 15 of the

Securities Act of 1933, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. This

matter is before the Court on defendants' motions to dismiss the Consolidated Second Amended

Complaint (the "SAC" or "Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and

12(b)(6), and the Private Securities Litigation Reform Act ("PSLRA").

*Background*

I.    *The Parties*

The plaintiffs purchased AmTrust securities: (i) through a public offering on

November 11, 2015 (the "November 2015 Offering"), (ii) through a public offering on September

27, 2016 of Non-Cumulative Preferred Stock, Series F (the "September 2016 Series F Offering"),

or (iii) on the secondary market (A) between and including February 14, 2013 and April 10, 2017

(the "AmTrust Class Period"), or (B) between and including March 3, 2014 and April 10, 2017 (the

"BDO Class Period").[1] The lead plaintiff, New England Carpenters Guaranteed Annuity and Pension Funds, purchased AmTrust securities during both the AmTrust and BDO Class Periods.[2] Plaintiffs Albano and Jupiter Capital purchased shares in or "traceable to" the November 2015 Offering.[3] Plaintiffs ILRT and Stanley Newmark purchased shares in or "traceable to" the September 2016 Series F Offering.[4]

Defendant AmTrust is a publicly traded, multinational specialty property and casualty insurer headquartered in New York.[5] Its products include workers' compensation, commercial automobile insurance, general liability and extended service and warranty coverage.[6]

Defendant Barry D. Zyskind has been the president and chief executive officer of AmTrust since 2000.[7] Defendant Ronald E. Pipoly Jr. served as the executive vice president and chief financial officer of AmTrust from 2005 until June 5, 2017.[8] Together, Zyskind and Pipoly are referred to as the "Officer Defendants."

---

[1] Consolidated Second Amended Complaint [hereinafter "SAC"] [DI 140] ¶ 1.

[2] *Id.* ¶ 19.

[3] *Id.* ¶¶ 20-21.

[4] *Id.* ¶¶ 22-23.

[5] *Id.* ¶ 24.

[6] *Id.*

[7] SAC [DI 140] ¶ 25.

[8] *Id.* ¶ 26.

In addition to the Officer Defendants, plaintiffs assert claims against current and former directors of the board (the "Director Defendants").[9] Each was a director at all times relevant to the allegations in the Complaint.[10]

Plaintiffs separately assert claims against certain underwriters of AmTrust securities (the "Underwriter Defendants"). Plaintiffs name Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley") as Underwriter Defendants in connection with the November 2015 Offering, and Keefe, Bruyette & Woods ("KBW"), Morgan Stanley, RBC Capital Markets, LLC ("RBC"), and UBS Securities LLC ("UBS") as Underwriter Defendants in connection with the September 2016 Series F Offering.[11]

Finally, plaintiffs assert claims against AmTrust's former auditor, BDO USA, LLP ("BDO"). BDO is an accounting firm headquartered in Chicago, Illinois, that provides clients with advisory, audit, assurance, consulting, and tax services.[12] BDO issued unqualified audit opinions on AmTrust's financial statements for each of the years 2012, 2013, 2014, and 2015.[13]

---

[9]
 The Director Defendants are Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, George Karfunkel, and Jay J. Miller. *Id.* ¶¶ 30-34.

[10]
 *Id.* ¶¶ 30-34.

[11]
 *Id.* ¶¶ 36-40.

[12]
 *Id.* ¶ 29.

[13]
 SAC [DI 140] ¶ 29.

## II. Facts

### A. AmTrust's Acquisition of Warrantech

At the heart of certain allegations in the Complaint is AmTrust's extended warranty business and its accounting treatment of certain revenue generated by a subsidiary called Warrantech. AmTrust acquired Warrantech in August 2010 through AmTrust's wholly-owned subsidiary, AMT Warranty.[14] Following the acquisition, Warrantech's former chairman and chief executive officer, Joel San Antonio, became the chairman of AMT Warranty.[15]

Warrantech provides extended service plans and warranty programs for retailers, dealers, distributors, and manufacturers in various markets.[16] In or around 2003, Warrantech recognized the majority of revenue from service contracts at the time of sale and deferred only a minor portion of that revenue.[17] That same year, the SEC began a review of Warrantech's periodic reports.[18] Upon conclusion of its review, the SEC provided guidance advising Warrantech to change its revenue recognition policy to recognize service contract revenue over the life of the contracts.[19] Warrantech implemented the change and announced it in its Form 10-K for the year ending March

---

[14]    *Id.* ¶ 70.

[15]    *Id.* ¶ 265.

[16]    *Id.* ¶ 70.

[17]    *Id.* ¶¶ 262-63.

[18]    *Id.* ¶ 262.

[19]    SAC [DI 140] ¶ 263.

31, 2006.[20] The change had "the effect of deferring to later periods the substantial portion of these revenues which the Company [] previously recognized up front."[21]

After AmTrust acquired Warrantech, the policy was changed back to Warrantech's pre-SEC review practice of recognizing the majority of service contract revenue at the time of sale.[22]

B.    *AmTrust's Growth*

Plaintiffs allege that AmTrust experienced "extraordinary" growth from 2012 to 2016.[23] During that time, the company increased its gross written premiums from $2.75 to $7.95 billion.[24] During the same period, its service and fee income nearly quadrupled, increasing from $138.6 million to $537.9 million.[25] For the year ending December 31, 2016, 40 percent of that service and fee income was generated by Warrantech.[26]

AmTrust acquired an additional three companies from October 2014 to April 2016.[27]

---

[20]    *Id.*

[21]    *Id.*

[22]    *Id.* ¶ 264.

[23]    *Id.* ¶ 63.

[24]    *Id.*

[25]    SAC [DI 140] ¶ 73.

[26]    *Id.* ¶ 74.

[27]    *Id.* ¶¶ 60-62.

Each acquisition was preceded by a positive earnings announcement that beat analysts' expectations and a subsequent capital raise through the sale of preferred stock or subordinated notes.[28] AmTrust then used at least a portion of the funds raised to finance the acquisitions.[29] As a result of AmTrust's strong performance, its share price rose over the AmTrust and BDO Class Periods, reaching an all-time high on August 5, 2015 of approximately $35 a share.[30]

C.      *Media Speculation Regarding AmTrust's Performance*

On December 12, 2013, GeoInvesting, LLC ("GeoInvesting"), an AmTrust short-seller[31] and, according to its website, a provider of premium microcap research,[32] published a report titled "AmTrust Financial Services: A House of Cards?"[33] GeoInvesting found it suspicious that AmTrust was able to "beat[] consensus estimates for 14 consecutive quarters," while "tak[ing] on so many different types of risk."[34] The research company took "a deeper look into [AmTrust's]

---

[28]
    *Id.* ¶¶ 60-62.

[29]
    *Id.* ¶¶ 60-62.

[30]
    *Id.* ¶ 65.

[31]
    Declaration of Lawrence J. Zweifach [hereinafter "Zweifach Decl."] Ex. 20 [DI 149-20] at ECF p. 21.

[32]
    GeoInvesting, https://geoinvesting.com (last visited July 23, 2019).

[33]
    SAC [DI 140] ¶ 269.

[34]
    *Id.*

books and accounting."[35] It concluded that AmTrust "appear[ed] to be inflating earnings/net equity" by improperly accounting for intercompany transactions and thereby understating losses on foreign subsidiaries in its consolidated financial statements.[36] GeoInvesting questioned also the effectiveness of AmTrust's internal controls over financial reporting.[37]

Defendants Zyskind and Pipoly responded to the report on the same day it was published on a conference call with investors.[38] They said that the report contained factual inaccuracies and misstatements, and that all AmTrust foreign companies report "in our consolidation under US GAAP [Generally Accepted Accounting Prinicples]."[39]

Two months after the GeoInvesting report, on February 8, 2014, Barron's published an article titled "Turning Losses Into Gains," by Bill Alpert.[40] The article raised the same question as the GeoInvesting report with respect to AmTrust's accounting for foreign subsidiary losses.[41] In addition, it questioned AmTrust's accounting practices related to deferred acquisition costs.[42]

---

35

    *Id.*

36

    *Id.* ¶ 270.

37

    *Id.*

38

    *Id.* ¶ 271.

39

    SAC [DI 140] ¶ 271.

40

    Zweifach Decl. Ex. 21 [DI 149-21].

41

    SAC [DI 140] ¶ 274.

42

    *Id.*

On May 31, 2014, the same author published a second article titled "Balance Sheet Risk Makes AmTrust Shares Vulnerable."[43] The article questioned AmTrust's accounting related to intercompany transactions[44] and what the author described as AmTrust's "inconsistent loss reserves that have the effect of flattering earnings and capital."[45] AmTrust responded with a statement that the articles were "replete with significant factual inaccuracies."[46]

D.   *AmTrust Announces That It Would Switch Auditors*

The media were not the only ones scrutinizing AmTrust in 2014. Regulators too were focused on the company, which came to light on September 16, 2014 when AmTrust filed a Form 8-K with the SEC. The filing stated that ACP Re Ltd. ("ACP"), a company affiliated with AmTrust through common ownership, had received approval from the New York Department of Financial Services ("NYDFS") to acquire a piece of Tower Group International, Ltd.[47] The approval letter, dated September 12, 2014, stated:

> "In light of AmTrust's growth and increased geographic footprint, AmTrust will engage an external auditing firm with corresponding global resources and skills beginning with the audit for the annual period ending December 31, 2015. Before the engagement is undertaken, the selection of the auditing firm shall be subject to

---

[43]     *Id.* ¶ 278; Zweifach Decl. [DI 149] ¶ 22.

[44]     SAC [DI 140] ¶ 281.

[45]     *Id.* ¶ 280.

[46]     *Id.* ¶ 281.

[47]     Zweifach Decl. Ex. 9 [DI 149-9] at ECF p. 4.

the review and prior approval of the Department [NYDFS]."[48]

E.    *AmTrust and Alistair Capital Management*

From subsequent events, it is apparent that the announcement did not put an end to concerns regarding AmTrust's accounting practices and internal controls.

On December 11, 2014, AmTrust filed in New York state court a summons against Alistair Capital Management, LLC ("Alistair"), which is a registered investment adviser, as well as against Alistair's founder, Casey H. Nelson, GeoInvesting, and a number of individuals.[49]  The summons gave notice of AmTrust's claims "arising out of defendants' attempt to damage plaintiff's reputation and business and manipulate its stock price through the dissemination of actionable false and misleading statements concerning plaintiff's business, as well as other conduct, as part of an organized scheme to harm that business."[50]

Seven days later, on December 18, 2014, Alistair issued a public letter to the members of AmTrust's audit committee alerting them to what Alistair believed to be "numerous instances of improper accounting and indications of material weaknesses in internal controls over financial reporting."[51]  Specifically, the letter questioned AmTrust's practices with respect to: (1) accounting for deferred acquisition costs, (2) its valuation of life settlement contracts, (3) reinsurance assets

---

[48]
      *Id.*

[49]
      SAC [DI 140] ¶¶ 287-88.

[50]
      Summons with Notice, NYSCEF Doc. No. 1, Index No. 653816/2014.

[51]
      SAC [DI 140] ¶ 292.

related to Maiden Holdings, Ltd., (4) the consolidation of Luxembourg reinsurance captives, and (5) accounting for loss and loss adjustment expense reserves assumed in acquisitions.[52] Alistair urged the AmTrust audit committee to initiate an investigation into the company's financial controls and accounting practices.[53]

F.  *AmTrust's November 2015 Public Offering*

On June 11, 2015, AmTrust filed with the SEC on Form S-3 a registration statement for the offer and sale of, *inter alia,* common and preferred stock.[54] Pursuant to that registration statement, AmTrust filed a preliminary prospectus on November 10 and a prospectus supplement on November 12, 2015 (the "prospectuses," and together with the registration statement, the "November 2015 Offering Materials").[55] The prospectuses stated that AmTrust was offering 5,000,000 shares of common stock.[56] They incorporated by reference AmTrust's annual report for the year ending December 31, 2014 filed on Form 10-K, and the quarterly report for the quarter ending March 31, 2015 filed on Form 10-Q.[57] The offering was held on or about November 11, 2015

---

[52]  Zweifach Decl. Ex. 24 [DI 149-24] at ECF p. 3.

[53]  *Id.* at ECF p. 2.

[54]  SAC [DI 140] ¶ 148.

[55]  *Id.* ¶¶ 149-50.

[56]  *Id.* ¶¶ 149-50.

[57]  *Id.* ¶ 150.

and raised $320,000,000.[58]  Citigroup and Morgan Stanley underwrote the transaction.[59]

The November 2015 Offering is the first of two upon which plaintiffs' Securities Act claims are based.  Before the Court describes the second offering, a brief discussion of several intervening events is necessary.

G.    *AmTrust Announces Dismissal of BDO and Hiring of KPMG*

On April 4, 2016, AmTrust announced in a press release filed on Form 8-K that the audit committee had "approved the dismissal of BDO," which became effective as of the date of its completion of the audit for the first quarter of 2016.[60]  The press release announced also that the accounting firm, KPMG LLP ("KPMG"), would replace BDO as AmTrust's auditor "beginning with the second fiscal quarter of 2016, and for the fiscal year ending December 31, 2016."[61]

Harkening back to 2014, and in a seemingly repeating pattern, the announcement was followed by an article published in Barron's on April 23, 2016 questioning the valuation of AmTrust shares in light of the same author's concerns over the company's accounting practices.[62]  Just as he had done in his May 2014 article, the author discussed the adequacy of AmTrust's reserves and the

---

[58]     *Id.* ¶ 1.

[59]     *Id.* ¶ 150.

[60]     SAC [DI 140] ¶ 308.

[61]     *Id.* ¶ 309.

[62]     *Id.* ¶¶ 302-03; Zweifach Decl. Ex. 23 [DI 149-23].

propriety of its accounting for intercompany transactions.[63]


H.   *AmTrust's September 2016 Series F Offering*

On September 20, 2016, AmTrust filed another preliminary prospectus pursuant to the 2015 registration statement announcing an offering of depositary shares.[64]  The following day, the company filed a prospectus supplement (together with the preliminary prospectus and 2015 registration statement, the "2016 Series F Offering Materials").[65]  The 2016 Series F Offering Materials incorporated by reference the company's annual report filed on Form 10-K for the year ending December 31, 2015,[66] the company's quarterly report filed on Form 10-Q for the quarter ending March 31, 2015, and various reports filed with the SEC on Form 8-K from January through August 2016.[67] The materials provided also historical financial data based on the company's annual financial statements for the years ending December 31, 2011 through 2015.[68] The offering concluded

---

63

Zweifach Decl. Ex. 23 [DI 149-23] at ECF pp. 2-3.

64

SAC [DI 140] ¶ 151.

65

*Id.* ¶ 152.

66

Though the company had announced on a Form 8-K filed September 16, 2014 and discussed above that it would switch auditors beginning with the annual report for the year ending December 31, 2015, the switch did not occur until after the first quarter of 2016.

67

SAC [DI 140] ¶ 152.

68

*Id.*

on September 27, 2016 and raised $278.2 million.[69] Morgan Stanley, UBS, RBC, and KBW underwrote the transaction.[70]

The September 2016 transaction is the second public offering upon which plaintiffs' Securities Act claims are based.

I.    *AmTrust Announces That it Would Correct Financial Statements for 2014 and 2015 and Make Corrections to Certain Financial Information for 2012 and 2013*

Prior to the opening bell on February 27, 2017, AmTrust announced that it was delaying the filing of its annual report on Form 10-K for the year ending December 31, 2016 and that it expected to make certain corrections to its financial statements.[71] The relevant portion of the press release merits quoting in full:

> "On or before March 1, 2017, AmTrust intends to file a Form 12b-25 with the Securities and Exchange Commission providing the Company an automatic 15-day extension to file its Form 10-K for the year ended December 31, 2016. As previously disclosed, the Company appointed a new independent registered public accounting firm on April 1, 2016. Additional time is needed for the Company to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016, and, as a consequence, for the Company's auditor, KPMG LLP, to complete its audit procedures and audit of the consolidated financial statements included in the Form 10-K. The Company expects to file the Annual Report on Form 10-K within the 15-day extension period provided by Rule 12b-25.
>
> In addition, the Company expects to make immaterial corrections to errors in its financial statements for fiscal years ended December 31, 2015 and 2014 and certain financial information for fiscal years ended December 31, 2013 and 2012 for

---

[69]    *Id.* ¶ 153.

[70]    *Id.* ¶ 151.

[71]    *Id.* ¶ 76.

inclusion in the Form 10-K and these processes have not been completed. The Company is still evaluating corrections to its historical quarterly financial statements within these fiscal years. [Reference to footnote omitted].

In connection with the foregoing, the Company expects to disclose in the Form 10-K that, as part of its evaluation of its internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxely Act of 2002, the Company identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization. As the Company completes the preparation of its financial statements and the related audit process for fiscal year 2016, additional adjustments and/or material weaknesses could be identified. While the company believes that significant progress has been made in enhancing internal controls as of December 31, 2016 and in the period since, the material weaknesses have not been fully remediated due to insufficient time to fully implement and assess the design and operating effectiveness of the related controls. The Company will continue the process to enhance internal controls throughout 2017."[72]

The company held a conference call on the same day it issued the press release. On the call, when asked about the delay in filing the Form 10-K for the year ending December 31, 2016, Zyskind responded that it "simply [was] taking us more time to complete the work required for KPMG to complete its audit."[73] Pipoly then announced that AmTrust was adding several new positions to its financial leadership team.[74]

Following AmTrust's announcement that it would delay the filing of its Form 10-K, its common stock price fell $5.32 per share.[75]

---

[72]     Zweifach Decl. Ex. 11 [DI 149-11] at ECF p. 7.

[73]     SAC [DI 140] ¶ 79.

[74]     *Id.* ¶ 81.

[75]     *Id.* ¶ 83.

*J.*     *AmTrust Announces That It Would Restate its Financial Statements*

After the close of trading on March 16, 2017, AmTrust issued another press release

announcing that:

> "additional time is needed for the Company to complete its consolidated financial
> statements and assessment of internal controls over financial reporting for the fiscal
> year ended December 31, 2016, and, as a consequence, for the Company's auditor,
> KPMG LLP, to complete its audit procedures and audit of the consolidated financial
> statements included in the Form 10-K. Accordingly, the Company will file its Form
> 10-K for the year ended December 31, 2016 as soon as practicable."[76]

It continued:

> "the Audit Committee of the AmTrust Board of Directors, in consultation with
> management and its current and former independent auditors, concluded that the
> Company's previously issued consolidated financial statements for 2014 and 2015
> (including for each of the four quarters of 2015) as well as for the first three quarters
> of 2016 should be restated and should no longer be relied upon."[77]

The company disclosed that the restatement was necessary primarily due to two errors in its

historical consolidated financial statements. Specifically:

> "These errors relate to: (1) upfront recognition of a portion of warranty contract
> revenue associated with administration services, based on the interpretation of ASC
> [Accounting Standards Codification] 605, Revenue Recognition, used in the
> previously filed financial statements related to multiple-element revenue recognition,
> instead of deferring recognition of the revenue over the life of the contract; and (2)
> bonuses that were expensed in the year paid but that should have been accrued in the
> year earned based on ASC 710, Compensation, and ASC 270, Interim Reporting."[78]

Finally, AmTrust stated that it would "also make other miscellaneous adjustments that had been

---

[76]     Zweifach Decl. Ex. 12 [DI 149-12] at ECF p. 6.

[77]     *Id.*

[78]     *Id.* at ECF p. 7.

previously identified but not corrected because they were not material, individually or in the aggregate, to its previously issued consolidated financial statements."[79]

Following the announcements in the press release, AmTrust's common stock price fell $4.03 per share.[80]

### K.    *AmTrust Issues its Restatement*

On April 4, 2017, AmTrust filed with the SEC its annual report on Form 10-K for the year ending December 31, 2016.  The report included "restated audited [consolidated financial statements] as of and for the years ended December 31, 2015 and 2014, as well as restated unaudited quarterly financial data for fiscal year 2015 and the first three quarters of 2016."[81]  These items collectively are referred to as the "restated financial data and results."  The issuance of the restated financial data and results is referred to as the "restatement."

In an accompanying note, the company explained that the restatement related primarily to "the correction of two errors reported in our historical consolidated financial statements."[82]  It stated:

> "In accordance with accounting guidance presented in ASC 250-10 and SEC Staff Accounting Bulletin No. 99, *Materiality*, management assessed the materiality of these errors and concluded that they were material to the Company's previously

---

[79]

   *Id.*

[80]

   SAC [DI 140] ¶ 89.

[81]

   Zweifach Decl. Ex. 4 [DI 149-4] at ECF p. 3.

[82]

   *Id.*

issued financial statements. The two primary errors relate to: (1) upfront recognition of the portion of warranty contract revenue associated with administration services, instead of recognizing the revenue over the life of the contract, and (2) bonuses that were expensed in the year paid but that should have been accrued as earned based on ASC 270, *Interim Reporting* and ASC 450, *Contingencies*. We have also identified other adjustments . . . that we have corrected as part of this Restatement."[83]

The additional adjustments identified and corrected as part of the restatement – but not assessed as material by management – were described as follows:

(1) "Deferred Acquisition Costs – The Company corrected errors in its calculation of deferred acquisition costs related to (a) the over-amortization of certain deferred acquisition costs in 2015, resulting in an overstatement of expenses in 2015, (b) the capitalization of certain salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (c) the treatment of certain costs in the Company's U.K. operations as both underwriting expense and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (d) the inclusion of deferred warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs."[84]

(2) "Foreign exchange gain/(loss) – The Company corrected errors related to the re-measurement of monetary balances denominated in foreign currencies into their functional currencies that were recorded as other comprehensive income. Given the monetary nature of some of these assets, the re-measurement impact should have been recorded as foreign currency transaction gain/(loss) in our income statements."[85]

(3) "Capitalized software – The Company capitalized certain internally developed software costs that did not meet criteria for deferral under ASC 350, *Intangibles - Goodwill and Other*. This error resulted in an over-capitalization of certain software expenses, and an understatement of expenses."[86]

(4) "Imputed interest – The Company corrected an error related to interest imputed

---

83

    *Id.*

84

    *Id.* at ECF p. 9.

85

    *Id.*

86

    *Id.*

on contingent consideration owed as a result of certain business acquisitions, which resulted in an understatement of interest expense in 2015."[87]

(5) "Intercompany eliminations – The Company corrected an error related to internal brokerage commissions paid from one of its subsidiaries to another subsidiary, which should have been eliminated in consolidation, thereby causing an overstatement of commission income in 2015."[88]

(6) "Other items – The Company corrected other errors that impacted the 2014 and 2015 consolidated financial statements, including unaccrued liabilities, uncollectible other receivables, accrued commissions, unrecognized amortization expense, unrealized loss on investments and proper year end cut-off related to premiums and claims."[89]

(7) "Balance Sheet Items – The Company historically recorded certain receivables (premium and other) net of commissions and now records the receivables on a gross basis, with the associated commission payable in other accrued expenses and liabilities. In addition, the Company corrected a classification error involving short term investments and cash/cash equivalents, and fixed assets and other investments in the Consolidated Balance Sheets."[90]

The company identified also certain internal control deficiencies that "contributed to the restatement."[91]   In a subsection of the explanatory note devoted to "Internal Control Considerations," the company stated the following:

"As previously disclosed, in assessing the effectiveness of our internal control over financial reporting as of December 31, 2016, management identified certain material weaknesses. Specifically, management concluded that we did not maintain effective internal control over financial reporting as of December 31, 2016 due to ineffective

---

[87]

*Id.* at ECF p. 10.

[88]

Zweifach Decl. Ex. 4 [DI 149-4] at ECF p. 10.

[89]

*Id.*

[90]

*Id.*

[91]

*Id.* at ECF p. 4.

assessment of the risks of material misstatement in financial reporting and insufficient resources in our corporate accounting and corporate financial reporting groups. . . . As a result of these deficiencies, we now believe our internal control over financial reporting was not effective as of December 31, 2015."[92]

The restatement resulted in "decreased service and fee income, increased acquisition costs and other underwriting expenses, and decreased interest expense, which ultimately resulted in decreases to net income."[93] Plaintiffs do not allege any decrease in AmTrust's share price as a result of the filing of the 10-K for the year ending December 31, 2016.

### L. BDO's Role

BDO issued unqualified audit opinions on AmTrust's financial statements and internal controls for each of the years ending December 31, 2012 through 2015.[94] BDO's audit opinion dated March 2, 2015 – reflecting BDO's conclusions from its audit of AmTrust's consolidated financial statements for the year ending December 31, 2014 – was included in the November 2015 Offering Materials.[95] Its audit opinion dated February 29, 2016 – reflecting BDO's conclusions from its audit of AmTrust's financial statements for the year ending December 31, 2015 – was included in the September 2016 Series F Offering Materials.[96] These opinions each

---

[92]      *Id.*

[93]      *Id.* at ECF p. 3.

[94]      SAC [DI 140] ¶ 200.

[95]      *Id.* ¶ 205.

[96]      *Id.* ¶ 206.

represented that:

> "[BDO] conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements and schedules. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of AmTrust Financial Services, Inc. at December 31, [year audited] and [year prior to that], and the results of its operations and its cash flows for each of the three years in the period ended December 31, [year audited], in conformity with accounting principles generally accepted in the United States of America. . . .
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), AmTrust Financial Services, Inc.'s internal control over financial reporting as of December 31, [year audited], based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated [month, day, year] expressed an unqualified opinion thereon."[97]

With respect to BDO's audit of AmTrust's consolidated financial statements for the year ending December 31, 2013 and the audit of AmTrust subsidiaries' financial statements for the same year (the "2013 Consolidated Audit" and "2013 Subsidiary Audit," respectively), the Complaint alleges certain irregularities and misconduct. Richard J. Bertuglia of BDO was staffed as the engagement partner on that audit.[98] He was supported by John W. Green, who served as the

---

[97]  *Id.* ¶ 205.

[98]  *Id.* ¶ 552.

engagement quality review partner, and Lev Nagdimov, who served as a senior manager.[99] Bertuglia's responsibilities included supervising the work of the audit team and ensuring that the audit complied with Public Company Accounting Oversight Board standards.[100]  Green was responsible for reviewing the bases for the overall conclusion of the audit and preparing the engagement report "to determine whether to provide concurring approval of issuance."[101]

In December 2013, the audit team informed Bertuglia and Nagdimov that the audit was approximately 14 weeks behind schedule.[102]  In consequence, Bertuglia instructed the team to focus on the 2013 Consolidated Audit and delay work on the 2013 Subsidiary Audit.[103]  The team did as instructed.[104]  In doing so, they "departed from their original audit plan" and did not document the change.[105]

On February 21, 2014 – one week before the February 28, 2014[106] audit deadline – Bertuglia met with the audit team and told them to finish incomplete work in three specific areas:

---

[99]

   *Id.*

[100]

   *Id.* ¶ 553.

[101]

   SAC [DI 140] ¶ 554.

[102]

   *Id.* ¶ 556.

[103]

   *Id.* ¶ 558.

[104]

   *Id.* ¶ 559.

[105]

   *Id.*

[106]

   *Id.* ¶ 558.

journal entry testing, internal controls testing, and material account balances.[107]  A few days later, Nagdimov told the team to load and sign all work papers in BDO's electronic system, including blank work papers – or placeholders – so that the signatures would bear an electronic time stamp that pre-dated the deadline.[108]  The team members did as they were told.[109]

On February 28, 2014, the audit deadline, Bertuglia and Green discovered incomplete work papers while reviewing the audit work.[110]  Nagdimov told them that the papers were complete but had not been loaded into the system yet due to technical issues.[111]  Bertuglia then authorized the release of an unqualified audit opinion on AmTrust's 2013 consolidated financial statements and internal controls.[112]

Afterward, Bertuglia and Green learned that AmTrust would not file its Form 10-K until March 3, 2014, thereby extending the audit deadline from February 28 to March 3.  Bertuglia and Green spent that time signing 2,000 work papers, a number of which they did not review.[113]

---

[107]    SAC [DI 140] ¶ 561.

[108]    *Id.* ¶¶ 561-62.

[109]    *Id.* ¶ 563.

[110]    *Id.* ¶ 564.

[111]    *Id.*

[112]    *Id.* ¶ 566.

[113]    SAC [DI 140] ¶ 567.

Bertuglia then "redated BDO's audit report to March 3, 2014."[114] Neither he nor Green checked whether the incomplete work papers they had discovered on February 28 in fact had been completed.[115]

On March 7, 2014, Bertuglia learned that the audit team did not finish work related to the 2013 Consolidated Audit, including testing certain journal entries, internal controls, and material accounts.[116] Bertuglia and Green decided that the team needed to finish the work and "assess their potential impact on BDO's audit report, as required by AU Section 390, Consideration of Omitted Procedures After the Report Date."[117] The team completed the work over the following month but did not amend the dates on those documents that had been loaded into the system prior to the deadline as placeholders or incomplete drafts.[118] When all the work was complete, Bertuglia reviewed it and determined that it did not affect BDO's unqualified audit opinion or require any action pursuant to AU Section 390.[119]

On April 11, 2017, the Wall Street Journal reported that the FBI and SEC had opened investigations into AmTrust's accounting practices based at least in part on information provided

---

[114]    *Id.*

[115]    *Id.*

[116]    *Id.* ¶ 568.

[117]    *Id.* ¶ 570.

[118]    *Id.* ¶ 571.

[119]    SAC [DI 140] ¶ 573.

by a former BDO auditor who had come forward as a whistleblower.[120] The whistleblower had

discussed the AmTrust audit with colleagues in 2014 and had been "directly assigned to AmTrust

audits for at least three years."[121] According to the whistleblower, "BDO often was rushed during

its audits, partly because AmTrust was late or inconsistent in providing figures, or lacked

documentation."[122] And "[a]t least twice, BDO formally signed off on its AmTrust audit before

completing some important checks."[123] BDO staff allegedly "covered for their lapse by loading

unfinished documents into an internal software system to show the right time stamp, then returned

later to complete some of the work."[124]

In October 2018, the SEC sanctioned Bertuglia, Green, and Nagdimov for their

conduct in relation to the 2013 Consolidated Audit.[125]


## II.  *Plaintiffs' Claims*

Plaintiffs assert claims under the Securities Act and the Exchange Act against

AmTrust, the Officer Defendants, Director Defendants, the Underwriter Defendants, and defendant

BDO.  Their claims focus on accounting issues and material weaknesses that AmTrust identified in

---

[120]

*Id.* ¶ 218; Zweifach Decl. Ex. 25 [DI 149-25].

[121]

Zweifach Decl. Ex. 25 [DI 149-25] at ECF pp. 2-3.

[122]

*Id.* at ECF p. 6.

[123]

*Id.*

[124]

*Id.*

[125]

SAC [DI 140] ¶¶ 576, 578-79.

2016 and 2017, and corrected in the restatement. As against AmTrust, the Officer Defendants, and BDO, plaintiffs assert theories of both negligence and fraud.

Defendants moved to dismiss the claims. For the reasons set forth below, defendants' motions are granted.

*Discussion*

I.    *Motion to Dismiss Standard*

To survive a motion to dismiss, a plaintiff must allege sufficient facts to "state a claim to relief that is plausible on its face."[126] The Court accepts as true all well-pleaded factual allegations and "draw[s] all reasonable inferences in the plaintiffs' favor."[127] The Court, however, is not obliged to accept as true legal conclusions.[128] And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice" to defeat a motion to dismiss.[129] In deciding a motion to dismiss, the Court considers the complaint, "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[130]

---

[126] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

[127] *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

[128] *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

[129] *Id.* (quoting *Iqbal*, 556 U.S. at 678).

[130] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

A complaint that pleads fraud under the securities laws must satisfy additional, heightened pleading requirements. These are the requirements of Rule 9(b) and the PSLRA.[131] Rule 9(b) requires a plaintiff to plead "with particularity the circumstances constituting fraud."[132] To do so, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[133] The PSLRA requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[134]

## II. The AmTrust Defendants

Plaintiffs assert claims against the AmTrust defendants under Sections 11, 12(a)(2), and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act. The Court begins with plaintiffs' Securities Act claims.

### A. Securities Act Claims

Sections 11 and 12(a)(2) of the Securities Act impose liability on issuers and other

---

[131]    *Id.* at 99.

[132]    FED. R. CIV. P. 9(b).

[133]    *ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[134]    15 U.S.C. § 78u–4(b)(1).

signatories of a registration statement or prospectus that contains "materially misleading statements or omissions."[135] Section 15 imposes liability on any person who controlled an individual liable under Sections 11 or 12(a)(2).[136]

To state a claim under Sections 11 and 12(a)(2), the plaintiff must allege that the registration statement or prospectus contained: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading."[137] If a plaintiff establishes one of these three things, then "the general rule is that an issuer's liability is absolute."[138] This general rule is subject to exception, of course.

The exception applies when the Section 11 and 12(a)(2) claims are "premised on allegations of fraud."[139] In these circumstances, a plaintiff must meet the additional pleading requirements of Rule 9(b). This is so because Rule 9(b) "applies to all averments of fraud."[140] And even though fraud is "not an element or a requisite to a claim under Section 11 or Section 12(a)(2)

---

[135] *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *see also* 15 U.S.C. § 77l(a)(2).

[136] 15 U.S.C. § 77o. A controlling person, however, will not be held liable if he or she had "no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *Id.*

[137] *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011).

[138] *Id.* at 716 (internal quotations, alterations, and citation omitted).

[139] *Rombach*, 355 F.3d at 171.

[140] *Id.* (internal quotations omitted).

. . . claims under those sections may be – and often are – predicated on fraud."[141] Accordingly, when the same course of conduct supports both a claim of fraud under the Exchange Act and a claim under Section 11 or 12(a)(2) of the Securities Act, the latter claim must satisfy the requirements of Rule 9(b) unless the complaint identifies clearly an alternate basis, i.e., negligence, for the claim.[142] Mere disavowal of any allegations that would make Rule 9(b) applicable will not suffice.[143]

Plaintiffs assert that the AmTrust defendants violated Sections 11 and 12(a)(2) by offering and selling securities pursuant to a registration statement and prospectuses that included untrue statements of material fact and omitted to state material facts necessary to prevent existing disclosures from being misleading.[144] The alleged untrue or misleading statements of material fact are the following:

(1)     Representations that the company "defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods;"[145]

(2)     Numbers and certain results, e.g., net income, in the company's consolidated

---

141

    *Id.*

142

    *Id.* at 171-172.

143

    *Id.* at 172 (citing *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 690-91 (S.D.N.Y. 2000)).

144

    Plaintiffs allege specifically that these misstatements were located in AmTrust's 2014 Form 10-K, 2015 Form 10-K, and Forms 10-Q for each of the first three quarters of 2015 and the first two quarters of 2016. SAC [DI 140] ¶¶ 154-198.

145

    *Id.* ¶ 163.

financial statements;

(3)     Representations that the consolidated financial statements were prepared in conformity with GAAP;

(4)     Signed certifications required under the Sarbanes-Oxley Act ("SOX certifications") attesting to the accuracy of the financial statements; and

(5)     Representations that disclosure and internal controls were effective, and SOX certifications attesting that the Officer Defendants disclosed deficiencies and material weaknesses in internal controls.

On this motion, the Court looks first to whether plaintiffs plead adequately an untrue or misleading statement and second to the materiality of the alleged misleading statement.


*1.     Alleged Untrue or Misleading Statements*

Much of the Court's analysis hinges on whether the alleged untrue or misleading statements are statements of fact or opinion. A plaintiff who challenges a statement of fact under the Securities Act must allege adequately that the fact was untrue at the time the statement was made or that it omitted to state a material fact necessary to make the statement made not misleading.[146] A plaintiff challenging a statement of opinion has a harder task. That plaintiff must do more than simply plead that the opinion was wrong. The plaintiff must plead facts that, if true, would be sufficient to show that: (1) the speaker did not actually hold the stated belief at the time the statement

---

[146]     15 U.S.C. § 77k(a).

was made,[147] or (2) the opinion did not rest on some meaningful inquiry, or standard process followed to reach such an opinion, thereby rendering it misleading to a reasonable person reading the statement fairly and in context.[148]

Plaintiffs, perhaps unsurprisingly, argue that the alleged untrue or misleading statements are statements of fact. Defendants disagree. If this were a case in which the alleged misstatements contained frequent trappings of opinion statements – qualifiers such as "I believe" or "I think" – then it would be an easy one. But it is not. Nearly all of the alleged misstatements concern at bottom financial data presented in the company's consolidated financial statements and the accounting principles applied to produce or arrive at that data.

It is important to underscore at the outset that this financial data – e.g., reported income – allegedly was false or misleading because of the accounting treatment applied to certain underlying metrics. It is the accounting treatment that plaintiffs contend was erroneous and thus resulted in a false or misleading number – reported income – on the financial statements.

Deciding which is the proper accounting treatment for a certain metric or transaction requires one to consult a governing set of accounting principles. These principles are referred to as GAAP, or Generally Accepted Accounting Principles ("GAAP"). They are used to report

---

[147]

*City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.*, 129 F. Supp. 3d 48, 72 (S.D.N.Y. 2015).

[148]

*Id.* at 71-72 (providing the example of a real estate appraiser's assessment of the value of property as an opinion or belief that could be misleading – and therefore a misstatement within the meaning of the Securities Act – if the appraiser failed to apply accepted principles of real estate valuation in reaching his or her opinion).

companies' financial results, including financial data such as net income.[149] The SEC has the authority to establish GAAP but historically has delegated the task to a private professional association, the American Institute of Certified Public Accountants, and two successor groups. The present group is called the Financial Accounting Standards Board ("FASB"). It issues a codification of GAAP called the Accounting Standards Codification ("ASC"), which is organized into approximately 90 accounting topics. FASB's ASC is authoritative for purposes of the federal securities laws.[150]

A financial datum in a company's financial statements – for example, a reported dollar figure with an associated description or characterization – may be a pure statement of an objective historical fact or it may reflect a result achieved by applying judgments to objective historical facts, in which case it is or reflects an opinion. Which is the case can depend upon on a number of different factors. The Court will address these factors in greater depth, in the specific context of this case, in a moment. But for now, suffice it to say that the Court's first task with respect to each alleged untrue or misleading statement is to determine whether it is one of fact or opinion. Based on that determination, the Court proceeds to its second task: determining whether plaintiffs plead adequately the falsity of the challenged statements under the appropriate standard concerning either statements of fact or opinion. Where relevant, the Court addresses too the question

---

[149] Generally Accepted Accounting Principles, Glossary, INVESTOR.GOV, U.S. SECURITIES AND E X C H A N G E C O M M I S S I O N , (https://www.investor.gov/additional-resources/general-resources/glossary/generally-accepted-accounting-principles-gaap) (last visited Aug. 7, 2019).

[150] Financial Accounting Standards Board, Glossary, INVESTOR.GOV, U.S. SECURITIES AND E X C H A N G E C O M M I S S I O N , (https://www.investor.gov/additional-resources/general-resources/glossary/financial-accounting-standards-board-fasb) (last visited Aug. 7, 2019).

of materiality.

a.    *Representations Regarding Service Revenue*

The first statement that plaintiffs allege was untrue or misleading is one that appears

in AmTrust's 2014 and 2015 Forms 10-K and concerns AmTrust's accounting for warranty fee

revenue. It is the following:

> "The Company recognizes revenue related to promotion, marketing and
> administration services at the time of the sale of ESP [extended service plan].
> However, the Company defers a portion of service revenue based upon an estimate
> of administrative services to be provided in future periods."[151]

Plaintiffs argue, and the Court agrees, that it is a statement of fact. It is not one of the more

complicated alleged misstatements based on financial data and the underlying inputs that the Court

addresses in a moment. It is a straightforward statement of fact. At the time the statement was

made, the company either recognized revenue at the time of sale or it did not. It either deferred a

portion of service revenue or it did not. If it deferred some service revenue, it either did so based on

an estimate of future administration services or it did not. The practice in place at the time the

statement was made was "determinate" and "verifiable."[152]

Plaintiffs allege falsity on the grounds that the statement omitted certain facts

necessary to make the statement made not misleading. Specifically, AmTrust allegedly failed to

disclose that the company "recognized the majority of revenue related to administration services at

---

[151]     SAC [DI 140] ¶¶ 162, 187.

[152]     *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318,
1326 (2015).

the time of the sale of the ESP."[153] Plaintiffs argue that a reasonable investor reading the statement actually made would have concluded the exact opposite. This is so, plaintiffs contend, because the statement explained that the company deferred service revenue to be provided in future periods and "warranty services are, by definition, to be provided in the future."[154] A reasonable investor therefore would conclude that the company *deferred* the majority of revenue related to warranty contracts, or ESPs.[155]

The argument assumes that: (1) revenue related to administrative service provided in the future exceeds revenue related to promotion, marketing, and other administrative service, and (2) the reasonable investor would have known this. Plaintiffs fail to plead any facts in support of these assumptions, and without any support for these necessary assumptions, plaintiffs are left to argue semantics.

Any argument plaintiffs could make based on defendants' language would fail because defendants' use of the term "portion" was accurate and not misleading. Portion is defined variously as: "a part of any whole; a section, a division; a portion, a fraction;"[156] an "allotment,

---

153

SAC [DI 140] ¶ 112.

154

Pls. Br. [DI 153] at 26 (stating that a reasonable investor would come to the conclusion that "because the Company defers warranty revenue relating to services to be provided in future periods, and because warranty services are, by definition to be provided in the future, the Company recognizes very little revenue up front and defers the majority").

155

*Id.*

156

*Portion, n., Definition*, Oxford English Dictionary, https://www.oed.com/view/Entry/148189?rskey=c1ksEZ&result=1#eid (last visited Sept. 5, 2019).

allowance, bite, cut, lot, part, partage, quota, slice;"[157] "a section or quantity within a larger thing; a part of a whole;"[158] and "an often limited part of a whole."[159] These definitions do not connote a "majority." If anything, they connote a minority, as indicated by the last definition cited.

Separately, defendants were under no duty to quantify the size of the minority of service revenue deferred.[160] They were under a duty only to speak accurately,[161] which they did. As a result, their use of the term "portion" – instead of a more descriptive term – is not actionable. Plaintiffs thus cannot state a claim based on this statement.

### b. Numbers and Results in the Consolidated Financial Statements

The second statement – or set of statements – that plaintiffs allege were untrue are numbers in AmTrust's consolidated financial statements for the years ending December 31, 2014 and 2015. These numbers, which the Court may refer to alternatively as financial data, are various types of reported income, including service and fee income, net income, net income attributable to AmTrust common stockholders, diluted earnings per share, and other measures of income.[162] The

---

[157] WEBSTER'S COLLEGIATE THESAURUS (1976).

[158] THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

[159] *Portion, n.*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/portion (last visited Sept. 5, 2019).

[160] *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159-60 (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)).

[161] *Id.*

[162] *See* SAC [DI 140] ¶¶ 156-57.

allegations concerning these types of reported income are based on AmTrust's decision to restate its consolidated financial statements for a number of years including 2014 and 2015. AmTrust made the decision after it identified accounting issues in seven different areas, at least two of which affected the reported income.

The parties disagree over whether these reported income numbers are statements of fact or opinion. If the numbers underlying that data consist only of figures that were then presently known, fixed, or definite – e.g., the price of widgets and number of widgets sold in a previous month – then any resulting data would be a statement of fact.[163] Likewise, if the relevant provision of GAAP or ASC topic applied to produce the data called only for the application of or evaluation under objective criteria, then the resulting data would be a statement of fact.[164] If, however, the relevant accounting guidance called for the exercise of judgment, then the resulting data would be a statement of opinion.[165] And, if determining the relevant provision of GAAP to apply in a certain area of accounting or with respect to a certain transaction involved a subjective evaluation, then any data resulting from that application of GAAP would be a statement of opinion.

---

[163]

See *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011).

[164]

See *id.*

[165]

See *id.*; *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *City of Westland*, 129 F. Supp. 3d at 68 ("While these estimates involve some factual inputs, they necessarily require judgment and thus are statements of opinion or belief, not of fact." (internal quotation marks omitted)); *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 09-md-2058 (PKC), 2013 WL 6504801, at *15 (S.D.N.Y. Dec. 11, 2013) ("[P]laintiffs have cited broad generalities that reflect [defendant's] subjective opinions, and not representations of fact.").

Plaintiffs argue that the financial data – or reported income numbers – are statements of fact because the data are "historical income metrics" that do not involve any "inherently subjective valuations."[166] They reject the proposition that *any* application of GAAP converts a financial metric into a statement of opinion.[167] And they argue that AmTrust's use of the word "error" to describe the accounting issues it identified demonstrates conclusively that any application of GAAP that resulted in said "errors" could have involved only the application of objective criteria and not a subjective evaluation or matter of judgment.[168] How else, plaintiffs argue, could AmTrust have determined that the accounting issues identified in fact were "errors" rather than "difference[s] of opinion between [BDO and KPMG]"?[169]

Defendants respond that their motion is not based on the contention that *any* application of GAAP – and therefore every financial metric in a company's consolidated financial statements – results in a statement of opinion. Rather, the specific provisions of GAAP relevant to the particular accounting issues that AmTrust identified call for subjective judgments.[170] Defendants

---

166

Pls. Br. [DI 153] at 21-22 (stating that "this case is not about complex accounting judgments over which reasonable minds can differ" (internal quotations and citation omitted)).

167

*Id.* at 21.

168

*Id.* at 22.

169

*Id.*

170

Defs. Reply Br. [DI 156] at 1-2.

Here, defendants' argument concerns only two of the accounting issues identified by defendants and that, according to defendants, drove the restatement. Defendants contend that the remaining accounting issues and the alleged misstatements based on those issues

point out that plaintiffs fail to refute this point.[171]  They argue also that plaintiffs' focus on the historical nature of income metrics is misplaced.  There is no bright-line rule distinguishing historical income metrics from estimates of future performance.  And the term "historical," as plaintiffs use it, is misleading.  The metrics are not akin to those in the widgets example above.  Instead, they involve inputs that reflect "subjective judgments," rather than those that are "objectively determinable."[172]  Finally, defendants explain that AmTrust's use of the word "error" to describe the accounting issues identified and "corrected" by the restatement has no bearing on whether the financial data upon which plaintiffs base their claims were factual statements or statements of opinion.[173]  When the "errors" resulted from "management's interpretation of accounting guidance," as defendants assert happened here, they are errors of opinion, not of fact.[174]

Whether the alleged misstatements are statements of fact or opinion depends on the facts and circumstances of the seven accounting issues identified by AmTrust and addressed in its restatement.  The Court thus takes each issue in turn.  It addresses first whether the data resulting from the particular accounting treatment at issue is as a statement of fact or opinion.  It turns then to the question of whether plaintiffs plead adequately that the data was untrue.

---

are immaterial.

[171]

*Id.*

[172]

*Id.* at 2.

[173]

*Id.* at 2 n.1 ("[I]t goes without saying that one can hold an erroneous or incorrect opinion. In other words, the mere existence of the Restatement, and AmTrust's reference to 'errors' does not support Plaintiffs' argument that the misstatements were *factual*." (emphasis in original)).

[174]

*Id.*

### *1.* *Recognition of Warranty Contract Revenue*

The first accounting issue that AmTrust identified, and upon which plaintiffs rely, concerns revenue recognition for warranty contract revenue associated with administration services. During the 2014, 2015, and part of the 2016 fiscal years, AmTrust recognized part of administration services revenue at the time of sale. It did so based on its interpretation of ASC Topic 605 titled Revenue Recognition – specifically, the section that addressed multiple-element revenue recognition.[175]

In its press release issued March 16, 2017, AmTrust announced that its practice of recognizing part of the service revenue upfront was in error. The company explained that it henceforth would recognize revenue related to administration services on a straight-line basis over the life of the contracts.[176] AmTrust stated that this change resulted from its "revised [] application of the revenue recognition guidance."[177]

Plaintiffs claim that the financial data resulting from AmTrust's revenue recognition practice prior to this switch constituted a misstatement of fact. To do so adequately, plaintiffs must put forward sufficient facts to permit a determination that the particular financial data they challenge indeed is *a statement of fact*. This is so because if they have not alleged facts sufficient to support a finding that the data could have resulted properly only from objective determinations, then they have not alleged sufficiently that the data was factually false. A particular datum – e.g., a particular

---

[175]
     *See* SAC [DI 140] ¶ 87.

[176]
     *Id.* ¶ 112.

[177]
     *Id.*

reported dollar figure on a financial statement – is not necessarily false if the reported result could have been reached by an appropriate method given appropriate historical data and judgments.[178] In this manner, the characterization of the statement as one of fact or opinion and the sufficiency of the pleadings with respect to falsity go hand in hand.

Thus, to establish that reported revenue and income figures resulting from AmTrust's revenue recognition practice prior to the switch, for example, constituted *mis*statements of fact, plaintiffs must plead first that an ASC topic or section of a particular topic objectively was the *only* correct guidance to apply. Second, they must plead that defendants did not apply that guidance and did not disclose either the particular guidance that they were applying, or that they had chosen not to apply the section that a reasonable investor would assume applied to the transactions. Only by doing both of these things could plaintiffs plead successfully that the alleged misstatements resulting from the accounting treatment of warranty contract revenue were statements of fact and that they were untrue when made.

The allegations in the Complaint with respect to the relevant ASC topic are limited to the following statement:

> "since sellers of extended warranty or product maintenance contracts (a/k/a extended service plans, or ESPs) have an obligation to the buyer to perform services throughout the contract period, revenue associated therewith is to be recognized over the period in which the seller is obligated to perform services pursuant thereto."[179]

---

[178] *See Fait*, 655 F.3d at 110-11.

[179] SAC [DI 140] ¶ 111.

This is a summary of the section of ASC Topic 605 related to services.[180]  Based only on this short

summary of revenue recognition guidance, and AmTrust's announcement in 2017 that it would

change its practice, plaintiffs allege that financial data in the 2014 and 2015 consolidated financial

statements were false due to improper reporting of revenue "in violation of GAAP."

These allegations are wholly insufficient.  They ignore an exception in the services

section of ASC Topic 605 that allows recognition of revenue on other than a straight line basis.[181]

And they fail to address the multiple-element section or the interaction between that section and the

services section of ASC Topic 605.  Absent facts alleging why the services section controls to the

exclusion of any other section,[182] and the reason or reasons why the exception within the services

---

[180]

Accounting Standards Codification Topic [hereinafter "ASC"] 605-20-25, FINANCIAL ACCOUNTING STANDARDS BOARD. The section states in relevant part:

"Sellers of extended warranty or product maintenance contracts have an obligation to the buyer to perform services throughout the period of the contract and, therefore, revenue shall be recognized in income over the period in which the seller is obligated to perform.  That is, revenue from separately priced extended warranty and product maintenance contracts shall be deferred and recognized in income on a straight-line basis over the contract period except in those circumstances in which sufficient historical evidence indicates that the costs of performing services under the contract are incurred on other than a straight-line basis. In those circumstances, revenue shall be recognized over the contract period in proportion to the costs expected to be incurred in performing services under the contract." *Id.*

[181]

*Id.* (stating that "revenue from separately priced extended warranty and product maintenance contracts shall be deferred and recognized in income on a straight-line basis over the contract period *except in those circumstances in which sufficient historical evidence indicates that the costs of performing services under the contract are incurred on other than a straight-line basis*" (emphasis added)).

[182]

For example, the Court is troubled by the following:

The services section of ASC Topic 605 applies to "separately priced extended warranty and product maintenance contracts." ASC 605-20-15.  The multiple-element section of ASC Topic 605 applies to "[a]ll deliverables (that is, products, services, or rights to use assets) within contractually binding arrangements (whether written, oral, or implied, and hereinafter

section did not apply, plaintiffs fail to plead the existence of a factual statement and one that objectively was untrue at the time it was made.

Plaintiffs' failure to allege adequately a false statement of fact, however, does not end the inquiry. The claim will survive the motion if plaintiffs have alleged adequately that the statement was an untrue or misleading statement of opinion. In determining whether plaintiffs have done so, the Court considers all the allegations in the Complaint, including those forming the basis of plaintiffs' securities fraud claims, for two reasons. First, as courts in this district have noted, establishing the misrepresentation element with respect to a statement of opinion essentially establishes the *scienter* element of a fraud claim, and *vice versa*.[183] Second, allegations of

---

referred to as arrangements) in all industries under which a vendor will perform multiple revenue-generating activities." ASC 605-25-15. With respect to the multiple-element section's interaction with other sections within ASC Topic 605 or in different ASC topics, it states: "A multiple-deliverable arrangement *may* be within the scope of another Codification Topic [including the following]: . . . For revenue recognition, see Topic 605; specifically, Subtopic[] 605-20 [Services]." *Id.* Whether such other Topics apply "is determined by the scope provisions of those Topics." *Id.*

The multiple-element section thus leads right back around to the services section. And in the circumstances, the Court cannot conclude that the services section governed this area of revenue recognition, and objectively so. The Court is unable to do so because the company's descriptions of and disclosures related to its warranty contracts, or ESP, do not reveal whether the contracts included only "separately priced" contracts. In addition, plaintiffs do not plead any facts alleging that the contracts at issue included only separately priced contracts.

183

    *See In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 569 (S.D.N.Y. 2007) (quoting *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004)).

The equivalence between falsity of an opinion and *scienter*, however, is not perfect. Establishing *scienter* invariably will establish the falsity of an opinion but the reverse is not always true. To plead falsity of an opinion, a plaintiff must plead only that it is plausible that the defendant did not actually hold the opinion at the time it was expressed. A plaintiff alleging *scienter* must do more. The plaintiff must demonstrate that the inference of *scienter* is "cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Additionally, where *scienter* is shown by alleging facts that constitute circumstantial evidence of intentional misbehavior

misstatements of opinion are based on knowing (or possibly reckless) conduct, and therefore likely

involve the same conduct that underlie claims of fraud. Accordingly, the requirements of Rule 9(b)

likely apply, and the Court looks to the allegations that would satisfy the requirements of that rule.

The allegations in the Complaint relevant to whether the financial data was an untrue

or misleading statement of opinion focus on Warrantech's historical accounting for warranty

contracts and the accounting change that it implemented based on guidance provided by the SEC in

2004. Plaintiffs claim that defendants would have been aware of the so-called SEC-mandated

change. Their position, as the Court understands it, is that defendants' decision to recognize revenue

in the manner they did either purposefully disregarded the SEC guidance in order to report results

that would appear stronger or recklessly disregarded it as a factor in the decision-making process,

thereby rendering their inquiry not a meaningful one. The facts alleged, however, do not support

either theory. Moreover, they ignore or fail to allege facts concerning crucial matters including the

ways in which the business had or had not changed and any changes to authoritative accounting

guidance in the interim. Absent any allegations related to these factors, the Complaint's reliance on

events from nearly a decade prior to establish wrongdoing (here, the falsity of an opinion) is

insufficient to render it plausible that defendants either did not believe that the multiple-element

section was the correct one to apply at the time or failed to conduct a meaningful inquiry before

choosing to apply that topic.

Plaintiffs' second argument focuses on the size and importance of the warranty

---

or recklessness, the showing must be "correspondingly greater." *Kalnit v. Eichler*, 264 F.3d
131, 142 (2d Cir. 2001). The facts, if true, must demonstrate either deliberate illegal
behavior or "conscious recklessness – i.e., a state of mind approximating actual intent, and
not merely a heightened form of negligence." *Novak*, 216 F.3d at 312 (2d Cir. 2000)
(internal quotations and citation omitted).

contract revenue to the Company. It too is unavailing. Plaintiffs argue that defendants must have known – or else buried their heads in the sand – about the "impropriety of AmTrust's accounting for service and fee income" due to the "financial significance" of the extended warranty business and amount of revenue it generated.[184] Defendants very well could have paid closer attention to the accounting for revenue generated by this business line, but plaintiffs fail to allege that in doing so, they purposefully chose an incorrect accounting method or failed to conduct a meaningful inquiry into the correct method to use.

Thus, plaintiffs fail to allege adequately that the financial data based on the accounting for warranty contract revenue were misstatements of opinion.

### 2. Bonus Accrual

The second accounting issue that AmTrust identified and that forms a basis of plaintiffs' claims regarding reported income concerns discretionary bonuses. During the years 2014, 2015, and the first three quarters of 2016, AmTrust expensed discretionary bonuses in the year in which they were paid.[185] It is unclear whether this accounting treatment was based on ASC Topic 710 titled Compensation, ASC Topic 450 titled Contingencies, or a combined reading of the two.[186] But when AmTrust disclosed that it would change its treatment of discretionary bonuses, it made clear that the change was based on management's "review of ASC 270, *Interim Reporting*, and ASC

---

[184]

SAC [DI 140] ¶¶ 289-91.

[185]

*Id.* ¶ 87.

[186]

Defendants note in the March 16, 2017 press release that the accounting treatment considered also to some extent ASC Topic 270 titled Interim Reporting. *Id.* ¶ 87.

450, *Contingencies*."[187] Following that review, management determined that the prior treatment had been "incorrect because, even though the bonuses were discretionary, the bonuses should have been estimated and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount."[188] In essence, AmTrust management had determined that ASC Topic 270 should control.[189]

As with the first accounting issue, to allege sufficiently that any financial data resulting from defendants' accounting treatment of discretionary bonuses prior to the change in treatment constituted a misstatement of fact, plaintiffs must plead that an ASC topic objectively was the correct one to apply. If plaintiffs cannot overcome this hurdle, then they cannot plead falsity of a *fact* based on this area of accounting and the Court will proceed to analyze the claim as one asserting an alleged misstatement of opinion.

The Complaint makes no mention of the interaction between ASC Topics 450, 710, and 270, or the application of one over the others with respect to the accounting treatment for discretionary bonuses. The allegations simply cite Topic 450 and the principle that companies generally are required to record expenses in the period in which they are incurred.[190] Plaintiffs therefore do not allege that Topic 450 – or any other – objectively was the correct one to apply to the

---

187

    *Id.* ¶ 114.

188

    *Id.*

189

    ASC Topic 270 states that costs and expenses unrelated to revenue are charged against income in interim fiscal periods as incurred based on an estimate of the expenditure to be made at a later date. ASC 270-45-4, 270-45-7.

190

    *See* SAC [DI 140] ¶¶ 113-14.

discretionary bonuses.[191]  As a result, they fail to allege adequately that any financial data based on

this accounting treatment was a misstatement of fact.  The Court considers next whether they plead

adequately a misstatement of opinion.

Plaintiffs' allegations related to falsity are based on a report published by

GeoInvesting in December 2013, two articles published in Barron's in 2014 and a third published

in 2016, and a public letter from Alistair Capital to AmTrust's audit committee in December 2014.

The publicity and letter called into question certain of AmTrust's accounting.  Plaintiffs' theory is

that these published materials put defendants on notice of accounting issues.  Defendants, plaintiffs

contend, must either subjectively have disbelieved that the accounting for discretionary bonuses was

correct at the time AmTrust reported income based in part on that accounting treatment, or recklessly

---

[191]

The Court notes but does not decide that the decision of which topic to apply appears to involve a judgment call.

ASC Topic 270 directs companies to make charges to income in each interim period for all costs and expenses unrelated to revenue including: (1) direct expenditures made in the period, e.g., salaries and wages, and (2) accruals for estimated expenditures to be made at a later date, e.g., vacation pay.  ASC 270-45-7.  The objective of this guidance is "to achieve a fair measure of results of operations for the annual period and to present fairly the financial position at the end of the annual period.

ASC Topic 405, applicable to contingencies, defines a loss contingency as an "existing condition, situation, or set of circumstances involving uncertainty as to a [possible loss] to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450-20-20.  But that topic makes plain that it does not apply to "employment-related costs," which are covered elsewhere, including in ASC Topic 710.  ASC 450-20-15.

ASC Topic 710 applies to deferred compensation but it does not explicitly include or exclude discretionary bonuses.  It contains a cross reference to the guidance for interim periods but does so in the context of "compensated absences." ASC 710-10-15.

Thus, unless there are objective criteria to determine whether discretionary bonuses are more akin to "vacation pay" or "deferred compensation," and the Court at present is not aware of any, discretionary bonuses do not fit unambiguously under a single topic.

have disregarded the possibility that the accounting treatment was wrong.

There is a gaping hole in plaintiffs' theory. The published materials do not question or draw attention to AmTrust's accounting for discretionary bonuses.

The GeoInvesting report "raised questions about AmTrust's rapid growth and accounting practices" and specifically AmTrust's accounting for intercompany transactions.[192] The report posited that AmTrust could have been boosting earnings by "understating losses on foreign subsidiaries in its consolidated financial statements by improperly accounting for intercompany transactions," including by ceding "$276.9 million in losses [] to Luxembourg subsidiaries."[193] Nothing in the report, however, raised questions related or connected to the accounting for discretionary bonuses such that defendants could have been put on notice of any improprieties.

The first Barron's article questioned AmTrust's "bookkeeping" with respect to foreign subsidiary losses and deferred acquisition costs.[194] The second raised concerns regarding AmTrust's "insufficient loss reserves" and suggested that the insufficient reserves were connected

---

[192]

SAC [DI 140] ¶¶ 269-70.

[193]

*Id.* ¶ 270.

[194]

*Id.* ¶¶ 273-74.

The article explained that:

"Insurers put a portion of their premium revenues into a balance sheet reserve called 'unearned premiums,' while deferring a matching portion of commissions and other premium-generating expenses into an asset called 'deferred policy acquisition costs' — amortizing each over the course of the coverage. The ratio of these line items should be more or less steady across time and comparable businesses . . . ." Zweifach Decl. Ex. 21 [DI 149-21] at ECF p. 3.

According to one research firm, AmTrust may have been violating the matching principle and deferring costs more aggressively than revenues. *Id.*

to the company's accounting for intercompany transactions.[195] And the third addressed the adequacy of the company's reserves and accounting for intercompany transactions as well.[196]

The only thing mentioned in the Barron's articles that could be read as connected or related to the accounting for discretionary bonuses is the deferred acquisition costs. This is so because AmTrust disclosed that the accounting treatment of discretionary bonuses from 2014 through the third quarter of 2016 "created an error resulting in an overstatement of *acquisition costs*."[197] But there are no allegations that the deferred acquisition costs discussed in the Barron's article and those affected by AmTrust's accounting for discretionary bonuses are the same or even related in any way. And the Court determines from the text of the article that the two are distinct, unrelated issues.

The Alistair letter raised concerns over "numerous instances of improper accounting."[198] The letter groups the "instances of improper accounting" into five areas: (1) accounting for deferred acquisition costs, (2) valuation of life settlement contracts, (3) reinsurance assets related to Maiden Holdings, Ltd., (4) consolidation of Luxembourg reinsurance captives, and (5) accounting for loss and loss adjustment expense reserves assumed in acquisitions.[199] In the letter,

---

195

SAC [DI 140] ¶¶ 280-81.

196

*Id.* ¶ 303.

197

*Id.* ¶ 114.

198

Zweifach Decl. Ex. 24 [DI 149-24] at ECF p. 2.

199

*Id.* at ECF p. 3. In addition, the letter raised concerns over material weakness in internal controls over financial reporting. *Id.*

Alistair Capital raised an additional concern related to accrued expenses. It raised this concern in the context of the adequacy of the controls over financial reporting, explaining that AmTrust's "Accrued Expenses and Other Liabilities" balance increased "by more than one would expect" and that this could imply that AmTrust was "failing to recognize expenses, and thus overstating net income."[200]

The first important point to make with respect to the Alistair letter is that the deferred acquisition costs mentioned in it are the same as those mentioned in the Barron's article.[201] The reference to them thus could not have put defendants on notice of any accounting improprieties with respect to the discretionary bonuses.

The second point is that while the "accrued expenses" mentioned in the letter could relate to accounting for discretionary bonuses, there is no indication that was the case here. The Alistair letter was concerned with amounts on AmTrust's financial statements that "appear[ed] to be irreconcilable with one another."[202] In this context, Alistair Capital suggested that "[s]uch discrepancies *could imply* that AmTrust is failing to recognize expenses."[203] This was nothing more than speculation disconnected from any concrete suggestion of any existing issue regarding the recognition of certain expenses. Contrary to plaintiffs' assertion, it would not have put defendants on notice that their accounting for discretionary bonuses was wrong or required investigation.

---

[200] *Id.* at ECF p. 6.

[201] *See id.* at ECF p. 8.

[202] *Id.* at ECF p. 6.

[203] *Id.* (emphasis added).

Plaintiffs therefore fail to plead falsity with respect to the financial data based on AmTrust's accounting for discretionary bonuses.

### 3. Remaining Accounting Issues Identified by AmTrust

In addition to the two accounting issues addressed above, AmTrust noted in its March 16, 2017 press release that:

> "The Company will also make other miscellaneous adjustments that had been previously identified but not corrected because they were not material, individually or in the aggregate, to its previously issued consolidated financial statements. In addition, the Company expects to have certain other non-cash corrections related to deferred acquisitions costs and the capitalization of software development costs in 2016."[204]

The Court addresses first the "corrections" related to the deferred acquisition and software development costs before turning to the other miscellaneous adjustments.

### i. Deferred Acquisition Costs

AmTrust identified four specific concerns related to deferred acquisition costs:

> "(a) the over-amortization of certain deferred acquisition costs in 2015, resulting in an overstatement of expenses in 2015, (b) the capitalization of certain salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (c) the treatment of certain costs in the Company's U.K. operations as both underwriting expenses and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (d) the inclusion of deferred warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs."[205]

---

[204] SAC [DI 140] ¶ 87.

[205] *Id.* ¶ 116.

AmTrust did not identify the specific guidance it had applied, the review it undertook to identify these issues, or the guidance it chose to apply to these areas going forward after having identified them.

Plaintiffs allege that ASC Topic 944 titled Financial Services "establishes specific limitations on the deferral of those costs incurred in acquiring insurance contracts and notes that any such deferred costs are to be expensed over time via amortization."[206] Based on this single allegation, they claim that AmTrust improperly accounted for the four areas identified above, and that any resulting financial data was a misstatement of fact.

Plaintiffs fail to plead that ASC Topic 944 objectively applied to each of the four areas in which AmTrust identified issues and that AmTrust either: (1) did not apply ASC Topic 944, (2) did not disclose that it had selected different guidance to apply, or (3) applied ASC Topic 944 in a manner that was objectively wrong. In consequence, they fail to plead adequately that financial data derived from each of the four areas was a misstatement of fact. The Court is persuaded with respect to the third area, however, that duplication of numbers is not an act or determination that involves any subjective evaluation. Accordingly, to the extent that plaintiffs' claim is based on the third issue identified by AmTrust, plaintiffs plead adequately that the alleged misstatement is a statement of fact. The Court is satisfied also that the allegation – in this case, AmTrust's admission – of duplication sufficiently alleges falsity.

With respect to the other three areas, plaintiffs' allegations related to falsity again are based on the GeoInvesting report, the Barron's articles, and the Alistair letter, and their theory is the same. Plaintiffs contend that these published materials put defendants on notice of accounting

---

[206] *Id.* ¶ 115.

improprieties and that defendants therefore must have either subjectively disbelieved that their accounting for deferred acquisition costs was correct or recklessly disregarded that it was wrong.

The first Barron's article and the Alistair letter both mentioned deferred acquisition costs. The Barron's article noted that AmTrust could have been violating a matching principle by capitalizing costs more aggressively than revenue and thereby boosting profits. The article explained the matching principle as follows:

> "Insurers put a portion of their premium revenues into a balance sheet reserve called 'unearned premiums,' while deferring a matching portion of commissions and other premium-generating expenses into an asset called 'deferred policy acquisition costs' – amortizing each over the course of the coverage. The ratio of these line items should be more or less steady across time and comparable businesses . . . ."[207]

While the Court cannot determine with any certainty whether the "salaries and consulting fees" that AmTrust capitalized then later determined were not eligible for deferral – the second concern related to deferred acquisition costs that AmTrust identified – were subject to this matching, it views the costs as ones that plausibly could have been deferred based on an aggressive or perhaps improper interpretation of "premium-generating expenses." Plaintiffs thus allege plausibly that the article could have put defendants on notice of the issue and that they did not believe contemporaneously that their accounting treatment for these costs was correct.

The same is not true for the first concern related to deferred acquisition costs that AmTrust identified. The over-amortization of those costs resulted in an *over*statement of expenses. The Barron's article, however, warns of accounting practices that led to an understatement of

---

Zweifach Decl. Ex. 21 [DI 149-21] at ECF p. 3.

expenses.[208]  So too with the Alistair letter.[209]

The fourth concern is somewhat trickier.  AmTrust's disclosure indicates that it deferred improperly "warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs."  Viewing the allegations in the Complaint in the light most favorable to plaintiffs, these costs reasonably could be viewed as similar to the salaries and consulting fees, or the second area of concern.  It is plausible that these costs were aggressively or improperly deferred in violation of the matching principle, and that the Barron's article and Alistair letter put defendants on notice of that fact.  Accordingly, plaintiffs allege adequately a false statement of opinion on this basis.

The Court must determine whether plaintiffs plead adequately the materiality of the misstatements of fact and opinion that plaintiffs have alleged sufficiently.  It does so in short order, but first it addresses the remainder of the alleged misstatements based on certain accounting issues.

### ii.  *Capitalization of Software Development Costs*

In its 2016 Form 10-K, AmTrust disclosed that:

"The Company capitalized certain internally developed software costs that did not meet criteria for deferral under ASC 350, *Intangibles - Goodwill and Other*.  This error resulted in an over-capitalization of certain software expenses, and an understatement of expenses."[210]

---

208

*Id.* (stating that "AmTrust's seemingly high level of deferred costs means that the insurer's currently low operating expenses could rise sharply in the future").

209

*See* Zweifach Decl. Ex. 24 [DI 149-24] at ECF p. 8.

210

SAC [DI 140] ¶ 120.

It did not disclose whether these software expenses related to upgrades and enhancements or a new software project. The distinction is not trivial.

ASC Topic 350 sets out criteria for deferral of costs related to new projects that contain little if any room for subjective evaluation. Applying the criteria related to upgrades and enhancements, on the other hand, involves the exercise of judgment.[211]

The allegations in the Complaint do not address this distinction. As a result, plaintiffs fail to plead adequately the falsity of a statement of fact. In addition, their allegations are wholly insufficient to plead that the reported data was an untrue or misleading statement of opinion. AmTrust's accounting for software costs were not mentioned in the GeoInvesting report, Barron's articles, or Alistair letter and the Complaint contains no other facts that would indicate that defendants knew at the time that their accounting for these expenses was wrong, recklessly disregarded that possibility, or failed to conduct a meaningful inquiry into the proper way in which to account for these costs. In consequence, plaintiffs fail to allege a misstatement based on the accounting treatment of software expenses.

### iii.    Miscellaneous Adjustments

The allegations in the Complaint concerning the remaining accounting areas all follow the same pattern:

(1)    Plaintiffs cite a provision of accounting guidance and a principle or general rule contained therein;

---

[211]    ASC 350-40-25 (stating that to defer costs, the company must conclude that it is *probable that* [the] expenditures [on upgrades and enhancements] will result in additional functionality" (emphasis added)).

(2)    The following paragraph includes an excerpt from AmTrust's 2016 Form 10-K explaining that the company corrected an error related to a certain area of accounting;

(3)    The portion quoted contains no reference to any ASC Topic or other guidance that AmTrust previously had relied upon, or relied upon in the review process that led to the change; and

(4)    Plaintiffs fail to allege that each accounting area objectively was governed by a single ASC topic.

For the reasons already stated, such allegations fail to plead adequately the falsity of a statement of fact.

In addition, plaintiffs fail to plead adequately that the financial data based in part on any of the miscellaneous issues was an untrue or misleading statement of opinion. None of the published materials referenced or provided any kind of notice that AmTrust's accounting with respect to the miscellaneous issues might have been wrong. And while the materials do reference ceding insurance losses to foreign subsidiaries, that issue is not the same as the one that AmTrust described as "intercompany eliminations." The intercompany eliminations concerned "internal brokerage commissions paid from one of its subsidiaries to another subsidiary, which should have been eliminated in consolidation, thereby causing an overstatement of commission income in 2015."[212] The published materials never mention brokerage commissions or commission income. Thus, plaintiffs fail to plead adequately a misstatement based on the miscellaneous adjustments identified by AmTrust.

---

[212] Zweifach Decl. Ex. 4 [DI 149-4] at ECF p. 10.

### iv.  *Materiality*

A misstatement is actionable under the securities laws only if it is material.  A statement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."[213]  If an alleged misstatement is "obviously unimportant" then it will not survive a motion to dismiss.[214]

AmTrust distinguished between the deferred acquisition and software costs, and the other miscellaneous adjustments in the March 16, 2017 press release.  It explained that the latter were immaterial, both individually and in the aggregate.  It did not describe the former in terms of materiality one way or the other.  But notably, the remarks concerning both of these sets of accounting issues followed the company's disclosure that it was restating its financial statements primarily to correct two *material* errors – the accounting for warranty contract administration services revenue and discretionary bonuses.  The company did not attribute the restatement to the other accounting issues identified.  It stated only that it would make corrections to those areas in the restatement as well.  The Court thus rejects plaintiffs' argument that the deferred acquisition and software costs and miscellaneous adjustments were material because they were included in the restatement.

Plaintiffs plead only two other facts in support of materiality: (1) the percentages that reported income numbers were overstated and expenses understated, and (2) the drop in AmTrust

---

[213]

    *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal alteration omitted).

[214]

    *Id.*

stock price after the disclosure that the company had identified accounting errors and issues with internal controls. The allegations in the Complaint and AmTrust's disclosures, read together, indicate that the two facts alleged are attributable to the warranty contract and discretionary bonus issues. AmTrust's disclosures state that the deferred acquisition and software costs and miscellaneous adjustments had a quantitatively immaterial effect on reported income, and plaintiffs fail to plead facts rebutting this statement. Additionally, they fail to allege any ways in which misstatements related to deferred acquisition costs, software costs, and the miscellaneous adjustments would have been qualitatively material.

Thus, the Court concludes with the respect to the majority of plaintiffs' claims based on reported income numbers that plaintiffs fail to plead adequately the falsity of any alleged misrepresentation. In the circumstances where the plaintiffs have pleaded adequately the falsity of an alleged misstatement of fact or opinion, the Court concludes that the plaintiffs fail to plead adequately the materiality of those alleged misrepresentations, both individually and in the aggregate.

> c.  *Representations That Financial Statements Were Prepared in Conformity With GAAP*

Plaintiffs contend that statements in AmTrust's Forms 10-K and 10-Q representing that the company's "consolidated financial statements . . . have been prepared in conformity with accounting principles generally accepted in the United States of America"[215] are statements of fact. Financial statements are prepared in conformity with GAAP when they are prepared using the FASB ASC "as the source of authoritative principles and standards," and any relevant "[r]ules and

---

[215] SAC [DI 140] ¶ 159.

interpretive releases of the [SEC]."[216]

But plaintiffs are not alleging that defendants failed to apply the FASB ASC as the authoritative standards. Instead, they allege that defendants applied the ASC but reached incorrect results. The claim is derivative of the primary allegations regarding warranty contract revenue, bonus accrual, and the other accounting issues identified by AmTrust. Consistent with the Court's conclusion that the Complaint fails to state a claim based on any of these accounting issues, the allegations that defendants violated or failed to conform with GAAP fail too.[217]

>
> d.     *Signed SOX Certifications Attesting to Financial Statements'*
> *Accuracy*

Plaintiffs assert that the following statement that appears in various SOX certifications signed by defendants Zyskind and Pipoly is a statement of fact:

> "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."[218]

They argue that defendants are strictly liable for this statement because AmTrust's financial statements were inaccurate, as became evident when AmTrust disclosed that its financial statements should no longer be relied upon and would be restated.

Plaintiffs are wrong. The "SOX certifications contain[] an important qualification

---

[216]     ASC 105-10-10-1.

[217]     *See Fait*, 655 F.3d at 113.

[218]     SAC [DI 140] ¶ 158.

that the certifying officer's statements are true based on [his or her] knowledge."[219] The attestation is a statement of opinion. Accordingly, plaintiffs must allege more than that the financial statements themselves were inaccurate. They must allege sufficiently that defendants knew that the financial statements were inaccurate.[220]

Plaintiffs fail to do so for the same reasons they fail to plead falsity with respect to the statements of opinion regarding warranty contract revenue, discretionary bonuses, software expenses, and the other miscellaneous accounting issues. They fail too because they did not plead adequately that any misstatements or inaccuracies related to the deferred acquisition costs were material. Absent a sufficient allegation of materiality, the defendants' opinion that the financial statements fairly present in all *material* respects the financial condition of the company was not untrue or misleading when expressed.

e.  *Representations in the Form 10-K Regarding Sufficiency of Disclosure and Internal Controls and Signed SOX Certifications Attesting to Disclosure of Deficiencies and Weaknesses in Internal Controls*

Plaintiffs contend that statements in AmTrust's Forms 10-K and SOX certifications regarding the company's controls are statements of fact.[221] The first statement represents in relevant

---

219

*Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018) (internal quotations omitted) (quoting *Menaldi v. Och-Ziff Capital Mgmt. Group LLC*, 277 F. Supp. 3d, 500, 517 (S.D.N.Y. 2017)).

220

*See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007).

221

The Court disregards the statement included in SAC [DI 140] ¶ 137. The portion excerpted is irrelevant to plaintiffs' claims as it defines and sets out the purpose of internal controls. The only statement of fact contained therein possibly relevant to plaintiffs' claims is that

part that:

> "Our management, with participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended []) . . . . Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that . . . our disclosure controls and procedures are effective in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regrading required disclosure."[222]

The second states in relevant part:

> "Management has evaluated the effectiveness of our internal control over financial reporting as of December 31, 2014, based on the control criteria established in a report entitled *Internal Control - Integrated Framework (1992)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on such evaluation, we have concluded that our internal control over financial reporting is effective as of December 31, 2014."[223]

The third states in relevant part:

> "The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial

---

defendants are responsible for establishing and maintaining adequate internal control over financial reporting. The Court doubts that plaintiffs would argue that this statement is untrue.

[222]

SAC [DI 140] ¶ 160.

[223]

*Id.*

information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."[224]

All three statements concern the conclusions of management. Accordingly, they are statements of opinion and plaintiffs must do more than simply allege that the conclusions were wrong. They must allege adequately that defendants Zyskind and Pipoly reached a conclusion different from the one stated, or that defendants reached no conclusion at all.

Plaintiffs allege that the statements were false when made because defendants knew or recklessly disregarded the following facts and concealed them from investors: (1) "AmTrust's financial results were the product of fraudulent accounting due to [] violations of GAAP" in the company's accounting for warranty contract revenue, discretionary bonuses, deferred acquisition costs, software costs, and other miscellaneous items, (2) the company's disclosure and internal controls were "ineffective in assessing the risk of material misstatements" in eight areas of accounting and financial reporting, and (3) the SOX certifications signed by defendants Zyskind and Pipoly were "materially false and misleading."[225]

The Court takes these fact in reverse order. To begin, the third "fact" is not a fact but a claim. Indeed it is the very claim that plaintiffs try to establish here. Sufficient claims require actual facts alleged in support thereof in order to survive a motion to dismiss. This statement, styled by plaintiffs here as a fact, adds no support to their claim.

---

[224]
    *Id.* ¶ 158.

[225]
    *Id.* ¶ 323.

The second fact is one that is relevant to the state of things in or around 2017, not in or around 2015 when the challenged statements were made. Thus it adds no support to the argument that the challenged statement of opinion was not sincerely held at the time it was made.

Finally, the Court largely has rejected the first fact already. To the extent it has not, it does so now. While plaintiffs have pleaded adequately a misstatement with respect to the deferred acquisition costs, the Court did not conclude that they have pleaded adequately fraud, or *scienter*, with respect to that issue. *Scienter* requires a greater showing,[226] and it is not one plaintiffs have alleged sufficiently. They barely nudged their claim of a misstatement over the line from possible to plausible. They have not, however, alleged facts sufficient to show that the inference of *scienter* is at least as compelling as any opposing inference.[227] The Court concludes, based on all the facts alleged and materials that the Court may consider on this motion, that the inference of negligence is far stronger. Accordingly, plaintiffs fail to plead that the representations – and in particular the third representation – are misstatements of opinion.

Plaintiffs thus fail to state a claim under Sections 11 and 12(a)(2) of the Securities Act. Because they fail to allege adequately liability under these sections, their claim under Section 15 fails too.

B.      *Exchange Act Claims*

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection

---

[226]
See supra at n.183.

[227]
See Tellabs, 551 U.S. at 324.

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may proscribe."[228]  Rule 10b-5 is the SEC rule that implements that statute.  It prohibits "making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."[229]  Section 20(a) of the Act imposes liability on every person who controlled, directly or indirectly, any person liable under the Exchange Act or any rule promulgated thereunder unless the controlling person acted in good faith and did not directly or indirectly induce the violation.[230]

A claim asserted under Section 10(b) and Rule 10b-5 thereunder has six elements: "(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[231]  In addition to these elements, a plaintiff asserting fraud under the Exchange Act must plead facts sufficient to satisfy the requirements of Rule 9(b) and the PSLRA.  To overcome these additional hurdles, the allegations must identify with specificity the statements that the plaintiff contends were fraudulent, the context in which they were made, and the reason or reasons why the statements were fraudulent.[232]

---

228

*ECA, Local 134 IBEW*, 553 F.3d at 197 (quoting 15 U.S.C. § 78j(b)).

229

*Id.* (alterations omitted) (quoting 17 C.F.R. § 240.10b-5(b)).

230

15 U.S.C. § 78t(a).

231

*City of Westland*, 129 F. Supp. 3d at 65.

232

*ATSI*, 493 F.3d at 99; *see also* 15 U.S.C. § 78u–4(b)(1).

Plaintiffs assert that the AmTrust defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. They assert also a claim under Section 20(a) of the Exchange Act against the Officer Defendants. The statements at the heart of these claims fall into five categories:

(1)     Statements identical to those that form the basis of plaintiffs' Section 11 and 12(a)(2) claims already addressed by the Court;

(2)     Statements made on conference calls discussing or touting AmTrust's warranty contract business;

(3)     Statements made in response to news reports critical of AmTrust's business;

(4)     Statements that address foreign exchange transactions; and

(5)     Statements related to the 2016 Form 10-K filing delay, KPMG's work, the "errors" and "corrections" identified, and the restatement.

The Court addresses each in turn. Similar to the Securities Act claims, it must determine first whether the statements are statements of fact or opinion and whether they were false when made.


### 1.     Alleged Misstatements Asserted Under Sections 11 and 12(a)(2)

The alleged misstatements that fall into this group differ from those underlying plaintiffs' Securities Act claims in that they extend back to 2012. They are substantively identical in all other respects.

There are no unique facts related to the years 2012 and 2013 such that the analysis with respect to these alleged misstatements would differ in any way from the foregoing analysis with respect to the Section 11 and 12(a)(2) claims. Accordingly, the Court's analysis above applies here as well. It concludes that plaintiffs fail to plead adequately that any of the statements in this category

were untrue or misleading.

### 2. *Statements Regarding Warranty Contract Business*

The second group consists of statements related to the warranty contract business –

and health of AmTrust's business generally – that defendants made on ten conference calls and in

one press release between February 2013 and November 2016. These statements, in substance,

stated that the warranty contract business was strong, growing, stable, performing well, and that the

company expected those trends to continue.[233] With two exceptions, which the Court addresses in

a moment, the statements communicated the speaker's subjective assessment of the business line and

accordingly are statements of opinion.

Plaintiffs contend that these statements of opinion were "materially false and

misleading and/or omitted material information"[234] because:

> "they failed to disclose that the Company was inflating its results, including with its
> Specialty Risk and Extended Warranty business and other of its business segments,
> which the AmTrust Defendants knew or recklessly disregarded. Specifically, the
> Company was among other things, recognizing the majority of its warranty contract
> fee revenue related to administration services at the time of the sale of ESP. Instead,
> as AmTrust acknowledged in the 2/27/17 Press Release 'its warranty contracts should
> <u>not</u> be accounted for using the multiple-element guidance, but instead deferred over
> the life of the contract.' Ultimately, in the 2016 Form 10-K, the Company admitted
> that although it had 'historically recognized the majority of revenue related to
> administration services at the time of sale of ESP,' it would need to change 'its
> application of the revenue recognition guidance to record revenue related to
> administrative services on a straight-line basis over the terms of the ESP contract.'
> Further, AmTrust admitted that the impact of this accounting practice 'created an

---

[233]   *See* SAC [DI 140] ¶¶ 317, 328-29, 336, 344-45, 373, 380, 387-88, 415, 432, 455-57.

[234]   *Id.* ¶ 330.

overstatement of service and fee income' during the Class Period."[235]

These arguments regarding falsity simply repeat those made previously in the context of the Securities Act claims. The Court already has found them to be without merit.

There is a second reason why many, if not all, of these statements of opinion cannot give rise to a securities violation and it is this. They are expressions of puffery and corporate optimism that the company was permitted to make. "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what the data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."[236]

The Court returns now to the two exceptions, which are the following. The first is a set of statements made on a call in November 2014 that clarified, in response to an analyst's question, that the strong revenue numbers for the prior quarter resulted in part from the combination of new warranty business and earnings related to business generated in prior years, and were not the product of any unusual event.[237] The second is a statement made in a press release issued in November 2016 acknowledging the impact of "the decline in the British pound" on the company's top-line results related to the extended warranty business.[238] These are each statements of fact. But they are statements of fact that plaintiffs ignore completely. They plead no facts that would speak

---

[235] *Id.*

[236] *Rombach*, 355 F.3d at 174 (internal quotations and citation omitted).

[237] SAC [DI 140] ¶¶ 387-88.

[238] *Id.* ¶ 455.

to the falsity of these statements.

Plaintiffs thus fail to allege the falsity of any of these statements of opinion or fact.

### 3. Statements in Response to Critical Reporting

The third group contains statements made in response to the GeoInvesting report of December 2013 and the Barron's article of February 2014. The statements rejected the reports of improper accounting and described the article as inaccurate.[239] They affirmed that AmTrust's financial reporting and that of its foreign subsidiaries was in conformity with GAAP[240] and highlighted AmTrust's strong position and financial results.[241]

Plaintiffs argue that these statements were materially false and misleading or omitted material information because:

> "AmTrust, Zyskind, and Pipoly concealed from investors the true fact that AmTrust's financial results were materially misstated and should not be relied upon due to the Company's various violations of GAAP . . . including, *inter alia*, the improper reporting of intercompany transactions and deferred acquisition costs, which were known by AmTrust, Zyskind, and Pipoly, or recklessly disregarded by them during the Class Period."[242]

They contend also that the statements were false or misleading because AmTrust, Zyskind, and Pipoly knew or recklessly disregarded that "AmTrust's disclosure controls and internal controls were

---

[239]

    *Id.* ¶¶ 352, 355, 363.

[240]

    *Id.* ¶¶ 353, 362.

[241]

    *Id.* ¶ 352.

[242]

    *Id.* ¶ 356.

'ineffective' in assessing the risk of material misstatements relating to eight distinct areas of corporate accounting and financial reporting."[243]

The Court already has addressed whether representations that AmTrust's financial statements were prepared in conformity with GAAP are misstatements of fact or opinion and concluded that they are neither. That conclusion applies here.

The statements regarding the strength of AmTrust's position and results are statements of opinion. These statements, like those made in the context of AmTrust's warranty contract business, are puffery and statements of corporate optimism. They cannot support plaintiffs' claim.

Finally, the rebuttals of various points made in the GeoInvesting report and Barron's article are a mix of statements of fact and opinion. But the Court need not untangle each statement of fact from opinion because all the allegations of falsity already have been rejected by this Court in its discussion of the Securities Act claims. In brief, the Court determined – among other things – that the intercompany transactions and deferred acquisition costs referenced in the two publications were not the same issues as those similarly named and identified by AmTrust around the time of the restatement.

4.    *Statements Regarding Foreign Exchange Transactions*

The fourth group contains a single statement made on a conference call on August 4, 2015. In response to an analyst's question regarding "the potential impact of changes in foreign

---

[243]    SAC [DI 140] ¶ 364.

currencies on net income,"[244] Pipoly stated:

> "It's an odd phenomenon in the sense of what we've seen from a currency perspective, the volatility and the inconsistency between a period and currency rate versus an average exchange rate. I mean just to give you an example, at the end, at March 31, the exchange rate with the dollar and the pound was $1.47. Just fast forward to June 30, and that exchange rate was $1.57. That's why you see that that [sic] level of volatility and that's what you see flowing through on our income statement from foreign currency, but again it's essentially all a non-cash event . . ."[245]

Plaintiffs argue that the statement was materially false and misleading because the defendants failed to disclose during the AmTrust Class Period that AmTrust "improperly account[ed] for foreign currency gains and losses," in "violation of GAAP," and that the defendants "knew or recklessly disregarded" that fact.[246]

The Court already has discarded the premise of plaintiffs' argument in the section of this opinion that addresses the Securities Act claims against the AmTrust defendants. That section and its analysis applies with equal force here. Plaintiffs thus fail to allege a misstatement based on Pipoly's remarks of August 4, 2015.

### 5.  Statements Regarding Events Leading up to and Including the Restatement

The final group contains eight statements. They concern the delay in filing Form 10-Q for the third quarter of 2016 and Form 10-K for the year 2016, the issues AmTrust identified related to certain controls and areas of accounting, whether the issues were material, and the

---

[244]
  *Id.* ¶ 413.

[245]
  *Id.*

[246]
  *Id.* ¶ 414.

restatement.

The first statement was made during AmTrust's investor conference held on November 16, 2016. In response to an analyst's question regarding the delay in filing the Form 10-Q, Pipoly stated:

> "[T]his particular issue was resolved. And really, what it was the result of is, is that we needed to have – or KPMG needed to have additional time to evaluate the level of precision around a secondary control. And again, so we were having discussions in terms of whether the level of precision was there necessary in that secondary level of control to make sure that if it wasn't a precise enough control that it'd rise to the level of having a material weakness, which it did not. But it took a few days to evaluate it to make sure that we're both on the same page. . . . [A]s you go through the quarter, you're evaluating controls, and it's a significant part of an overall audit approach. So it was really designed around the precision of a secondary level control."[247]

Plaintiffs contend that the statement was materially false and misleading or omitted material information because the defendants knew or recklessly disregarded that the Company's disclosure and internal controls were "ineffective" in eight areas of accounting and financial reporting.[248] The Court already has found this argument unpersuasive. Moreover, there is no indication whether the control at issue here was one that AmTrust later identified as having a material weakness. Plaintiffs thus fail to allege that the facts upon which they base their argument even apply to the context in which this statement was made.

The next three statements concern AmTrust's determination in February 2017 that issues it had identified over the course of its review with KPMG were immaterial – a decision it

---

[247]  *Id.* ¶ 463.

[248]  *Id.* ¶ 464.

subsequently would reverse.[249]  Plaintiffs argue that these statements were materially false and misleading or omitted material facts because defendants knew or recklessly disregarded that the company had engaged in improper accounting practices for several years and that the effects of these improper practices were material.[250]  The Court repeats, perhaps unnecessarily, that plaintiffs have failed to establish the premise of their argument and accordingly, the argument fails here.

The same is true of the fifth statement, related to AmTrust's accounting treatment for administration service revenue prior to the fourth quarter of 2016.[251]

The sixth and seventh statements concern the reason AmTrust delayed filing its 2016 Form 10-K.  AmTrust explained on a conference call held on February 27, 2017 that the filing was delayed because KPMG needed more time to complete the audit and review the 10-K.[252]  Plaintiffs contend that the statements were false, misleading, or omitted material facts because defendants knew or recklessly disregarded that AmTrust allegedly had engaged in improper accounting practices for years, resulting in materially misstated financial statements that would need to be restated once the improprieties were uncovered.[253]  The failure to allege adequately any objectively improper

---

249

 *See* SAC [DI 140] ¶¶ 470, 474, 478.

250

 *See id.* ¶¶ 471, 475, 479.

251

 *Id.* ¶ 480.

252

 *Id.* ¶¶ 472, 476.

253

 *Id.* ¶¶ 473, 477.

accounting practices[254] dooms any claim based on these two statements.

The final statement appears in a March 16, 2017 press release and is a quotation from Pipoly discussing the reason for the restatement. He explained that the restatement "largely relate[s] to the timing recognition of revenue . . . in the Company's service and fee business."[255] Plaintiffs claim that the statement was false and misleading or omitted material facts because defendants "failed to disclose the full extent of their accounting improprieties which were so severe that they warranted numerous government investigations."[256] As the Court has noted, the Complaint fails to allege any accounting improprieties that were objectively determinable errors that defendants knew of at the time or recklessly disregarded. As a result, plaintiffs fail to allege a misrepresentation based on this final statement.

Each alleged basis for plaintiffs' 10(b) claims – and thus plaintiffs' 20(a) claims – is insufficient. The Court has concluded also that plaintiffs fail to state a claim under the Securities Act. Accordingly, the Court grants the AmTrust defendants' motion to dismiss.

### III. Underwriter Defendants

The Complaint asserts two claims against the Underwriter Defendants. The first

---

[254]

The Court notes that plaintiffs have alleged adequately an objectively improper accounting practice or mistake with respect to duplication of certain numbers, as discussed above, but they have failed to allege the materiality of this mistake or improper practice. Additionally, plaintiffs do not allege that the duplication was known to defendants or recklessly disregarded. Accordingly, it cannot support a claim here.

[255]

SAC [DI 140] ¶ 485.

[256]

*Id.* ¶ 486.

alleges a violation of Section 11 of the Securities Act, and the second alleges a violation of Section 12(a)(2) of the same. The bases for the claims are identical to those of the Securities Act claims asserted against the AmTrust defendants. The Court has concluded that plaintiffs fail to allege any untrue or misleading statements of material fact or opinion with respect to those claims. That conclusion applies here. Accordingly, the Underwriter Defendants' motion to dismiss is granted.

## IV. Defendant BDO

BDO audited AmTrust's financial statements for a number of years including 2012 through 2015. Plaintiffs' claims, broadly speaking, allege that BDO failed to conduct its audits in accordance with a set of auditing standards set by the Public Company Accounting Oversight Board ("PCAOB"). PCAOB is a nonprofit corporation established by Congress in 2002 to oversee the audits of public companies in order to protect investors and further the public interest in the preparation of accurate audit reports.

Plaintiffs assert claims against BDO under Section 11 of the Securities Act and Section 10(b) of the Exchange Act. The Court begins with the Securities Act claims.

### A. Securities Act Claims

Plaintiffs claim that BDO violated Section 11 of the Securities Act by making untrue or misleading statements of fact in its unqualified audit opinions that were incorporated into the November 2015 Offering Materials and the 2016 Series F Offering Materials. The alleged misstatements are the following:

(1)     Representations that BDO conducted its audits in accordance with PCAOB

standards;

(2)     Representations that BDO's audit opinions were unqualified; and

(3)     Representations that AmTrust's consolidated financial statements conformed
        with GAAP.

Plaintiffs argue that the first representation was untrue because BDO failed to comply with certain auditing standards.[257] With respect to the second representation, plaintiffs claim that it was misleading because BDO did not disclose that it failed to conduct a complete audit at the time it issued its unqualified opinion.[258] And the third representation is untrue, according to the plaintiffs, because BDO ignored AmTrust's "wrongful accounting" and therefore disbelieved the statement at the time it was made.[259]

### 1.     Representations That BDO Conducted its Audits in Accordance With PCAOB Standards

This claim is a mirror image of plaintiffs' claims against the AmTrust defendants alleging misstated financial data based on certain accounting issues. Just as many of the accounting principles at issue – or seemingly at issue – there called for subjective evaluations, so too here. The PCAOB auditing standards to which plaintiffs point are couched in inherently subjective terms. They require, for example, auditors to "obtain reasonable assurance" for their ultimate conclusions including by obtaining "sufficient competent evidential matter to afford a reasonable basis for an

---

257

     *Id.* ¶¶ 214-28.

258

     *Id.* ¶¶ 230-31.

259

     *Id.* ¶ 232.

opinion."[260] The standards concern "matters as to which reasonable professionals planning or conducting an audit reasonably and frequently could disagree."[261] As a result, the representation that BDO completed an audit in accordance with PCAOB standards is a statement of opinion.

In determining whether plaintiffs allege adequately the falsity of this statement of opinion, the Court considers all the allegations in the Complaint, including those averring fraud.[262]

> a.    *Alleged Failure to Follow PCAOB Standards Based on AmTrust's Disclosures in 2016 and 2017*

The Complaint alleges that defendant BDO failed to conduct its audits in accordance with PCAOB Auditing Standards ("AS") Nos. 5, 12, 14, and 15, and American Institute of Certified Public Accountants Standards ("AU") Sections 326 and 508.[263] These standards require: testing to evaluate the effectiveness of internal controls, risk assessment to identify and assess the risk of material misstatement in financial statements, collection of sufficient evidence to support overall conclusions, evaluation of results and risks to determine whether conclusions are supported

---

[260]

SAC [DI 140] ¶¶ 214, 217.

[261]

*In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 300 (S.D.N.Y. 2011).

[262]

*See supra* at 42-43 & n.183.

[263]

Prior to the creation of PCAOB, the American Institute of Certified Public Accountants set standards for financial statement auditing. At the time of the allegations in the Complaint, PCAOB was the controlling body. It had two sets of "equally authoritative auditing standards: (i) standards originally issued by the Auditing Standards Board ('ASB') of the American Institute of Certified Public Accountants ('AICPA') and adopted by the Board on an interim, transitional basis in April 2003 and (ii) standards issued by the Board." PCAOB Release No. 2015-002 at 2, Mar. 31, 2015. When the Board adopted the AICPA auditing standards, it continued to use the "AU section" reference numbers in its codification of standards. *Id.*

adequately, and a determination on whether financial statements are presented in accordance with GAAP. Plaintiffs argue that BDO failed to perform adequately the tasks required because they ignored and/or failed to catch the issues and weaknesses later identified by AmTrust.[264]

There are a number of factual allegations concerning testing that BDO did not perform prior to issuing its 2013 audit opinion, corners that were cut, and possibly worse.[265] But the Complaint alleges specifically that all audit work was completed after the 2013 opinion was issued, and that BDO determined that its audit opinion was unaffected by any of the results of that work. The audit opinion, as incorporated into both sets of offering materials and at the time "such part[s] became effective,"[266] therefore rested on a complete audit. All plaintiffs' process arguments fall away. The only quarrel plaintiffs could have with BDO regarding its representation at that point is its apparent decision not to amend the date of the audit report and opinion. But there are no claims

---

[264]

*Compare* SAC [DI 140] ¶ 213 (stating that BDO "ignored AmTrust's wrongful accounting," and "[i]n doing so, [] had reason not to believe that the financial statements included in the Offering Materials were fairly presented in conformity with GAAP"), with *Id.* ¶¶ 222-226, 227(b)-(c).

[265]

In addition, there are allegations based on the 2017 Wall Street Journal article. These allegations are duplicative of those based on the 2013 audit to the extent that the facts reported by the Wall Street Journal are identical to those alleged with respect to the 2013 audit. Specifically, the Journal reported that "BDO formally signed off on its AmTrust audit before completing some important checks," and "staffers allegedly covered for their lapse by loading unfinished documents into an internal software system to show the right time stamp, then returned later to complete some of the work." Zweifach Decl. Ex. 25 [DI 149-25] at ECF p. 5. The only key additional fact provided by the Journal is that BDO allegedly signed off on AmTrust audits *twice* before completing the work. The article, however, does not indicate the years in which this allegedly occurred, or whether it occurred in a single year with respect to different components of an AmTrust audit, e.g., the Consolidated Audit and the Subsidiary Audit. Accordingly, any allegations based on the Journal article are too vague and insufficient to support a claim.

[266]

15 U.S.C. § 77k(a).

that the date is a misstatement and even if plaintiffs were to so allege, it is far from certain that they could plead adequately the materiality of any such misstatement in these circumstances.

Consequently, plaintiffs' allegations boil down to an assertion that BDO should be held liable for failing to reach the same conclusion on subjective matters that AmTrust and KPMG reached in 2016 and 2017, and in so doing, failed to comply with auditing standards. The former does not establish the latter and such a difference of opinion is not actionable under the Securities laws.

### b. Alleged Failure to Follow PCAOB Standards Based on BDO's Conduct

Plaintiffs contend that defendant BDO failed to comply with several other auditing standards. These are AS Nos. 3, 5, 7, 8, 10, 13, 14, and 15, and AU Sections 230, 316, 326, and 508. They require: sufficient evidence and testing – or a reasonable basis – to form audit conclusions and documentation thereof; evaluation of certain risks to ensure that the audit results support the conclusion; and audit supervision and quality review to ensure that the work is performed as directed and significant judgments are double-checked. In addition, under AU Section 508, an auditor can issue an unqualified opinion only if the audit was conducted in accordance with PCAOB auditing standards.

According to plaintiffs, BDO failed to comply with these standards due its conduct associated with the 2013 Consolidated Audit and other conduct as reported in the Wall Street Journal in 2017. The allegations concern a failure to complete necessary checks and work papers before the issuance of the audit opinion, a concerted effort to conceal the fact that the work had not been done on time, and a failure of the engagement partner and quality review partner to supervise, review, and

verify the results and conclusions of the audit.

As the Court explained above, BDO's eventual completion of its audit work on the 2013 Consolidated Audit renders most of these factual allegations irrelevant except insofar as the plaintiffs may have a legitimate quarrel – though not necessarily an actionable one – with BDO over the date on its 2013 audit report and opinion. There are four areas, however, that were not "cured" by the completion of the audit work. These are the requirements of good faith and integrity in the exercise of due professional care, supervision of the audit, engagement quality review, and documentation.

Plaintiffs allege that the audit team acted in bad faith by loading incomplete documents into an internal software system so that they would show a time stamp that pre-dated the audit deadline but could be completed later, after that date. They allege that Bertuglia and Green fell short of their duties to supervise and review audit work, including by signing work papers they did not review and failing to verify that all work was performed prior to issuing the audit opinion. And they allege that the change to the work plan was never documented. These allegations render it plausible that Bertuglia disbelieved the statement that the audit was conducted in accordance with the relevant PCAOB standards at the time both sets of offering materials became effective. Plaintiffs thus have alleged adequately a misstatement of opinion.

But that is not all that plaintiffs must do. They must allege also that the misstatement was material. "At the pleading stage, a plaintiff satisfies the materiality requirement [of the securities laws] by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."[267] A plaintiff must do more than allege that an

---

[267] *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

"investor might have considered the misrepresentation or omission important."[268]  But it is unnecessary to "assert that the investor would have acted differently if an accurate disclosure was made."[269]

The Second Circuit has stated often the rule that a complaint may not properly be dismissed on a Rule 12(b)(6) motion "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[270]  This rule, however, does not establish a presumption of materiality, nor will it excuse a failure to plead an element of a claim.[271]  It simply is a reminder that materiality is a mixed question of law and fact and an instruction that district courts apply when evaluating well-pleaded facts relevant to materiality.

But here, there are no such facts.  Plaintiffs fail to allege any facts relevant to the way or ways in which BDO's failure to supervise, review, document, and perform in good faith the 2013 audit would have been significant to a reasonable investor in making investment decisions.  This is so particularly because the conduct ultimately had no effect on the 2013 audit opinion.

Plaintiffs thus fail to state a claim based on BDO's representation that it followed PCAOB standards.

---

[268]
    *Id.*

[269]
    *Id.*

[270]
    *Id.* at 162 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

[271]
    *See Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).

2.     *BDO's Unqualified Audit Opinions*

The parties agree that BDO's unqualified audit opinions are statements of opinion. Plaintiffs allege falsity on the basis that the opinion did not rest on a meaningful inquiry – namely, a complete audit conducted in accordance with PCAOB standards. The Court has addressed both the issue of completeness and that of compliance with auditing standards. The arguments are no more persuasive here than they were above. Accordingly, plaintiffs fail to allege a misstatement on this basis.

3.     *Representation That AmTrust's Consolidated Financial Statements Conformed With GAAP*

Plaintiffs concede that the representation that AmTrust's financial statements conformed with GAAP is a statement of opinion. They allege that the opinion is false because BDO ignored AmTrust's wrongful accounting and therefore disbelieved the opinion at the time it was expressed. They allege no facts, however, that could support this theory.

The allegations regrading the 2013 Consolidated Audit extend no further than an alleged failure to perform the audit work required coupled with a concerted effort to conceal that fact. The 2017 Wall Street Journal article likewise does not mention any practice or instance of BDO ignoring "wrongful accounting." Crucially, it distinguishes between what the whistleblower claims to have observed with regard to *AmTrust* and what he or she claims to have observed with regard to *BDO*. With respect to the former, the whistleblower claims to have observed "seemingly unsupported adjustments to financial schedules by a senior AmTrust executive," and "reliance on

'plugs,' or undocumented adjustments."[272] With respect to BDO, the whistleblower claims to have observed BDO sign off on AmTrust audits before completing important checks and staffers covering for their lapse by loading unfinished documents into an internal software system to show the right time stamp.[273] There is no bridge between the two. Put differently, the whistleblower does *not* claim that anyone else at BDO saw those accounting improprieties or that any audit team member knew of them and ignored them. In the absence of any facts alleging such a connection, the Complaint fails to allege falsity.

Perhaps recognizing this shortcoming, albeit belatedly, plaintiffs change their tune in their opposition brief and argue falsity on the grounds that BDO failed to conduct a complete audit in accordance with PCAOB standards, and therefore, the opinion did not rest on a meaningful inquiry. The Court's analysis on the completeness of the audit and its compliance with auditing standards thus applies here. So too does its conclusion. Plaintiffs fail to allege adequately a misrepresentation on the basis of this statement.

Plaintiffs thus fail to state a claim under the Securities Act against defendant BDO.

B.    *Exchange Act Claims*

Plaintiffs assert that BDO violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by making fraudulent statements in its unqualified audit opinion of AmTrust's financial statements for the year ending December 31, 2013. The alleged fraudulent statements are the

---

[272]

Zweifach Decl. Ex. 25 [DI 149-25] at ECF p. 6.

[273]

*Id.*

following:

> (1) BDO conducted its audit in accordance with PCAOB standards; and

> (2) BDO believed its audit provided a reasonable basis for its opinion.

As an initial matter, an Exchange Act claim differs from a Securities Act claim with respect to the elements that a plaintiff must plead sufficiently in order to state a claim. A claim brought under the Exchange Act that alleges sufficiently a misrepresentation and materiality is actionable only if the plaintiff pleads adequately another element – loss causation. Loss causation is "the proximate causal link" between the alleged material misrepresentation and "the plaintiff's economic harm."[274] To plead this element adequately, a plaintiff must allege that defendant's "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."[275]

With respect to the first alleged misstatement, the Court already has concluded that plaintiffs failed to allege adequately a material misstatement based on BDO's compliance with PCAOB standards *after* BDO had completed the audit work and determined that its 2013 audit opinion was unaffected by the results of the completed work. It determines now that the alleged misrepresentation is not actionable under the Exchange Act because plaintiffs fail to allege any disclosure and subsequent negative effect on the value of AmTrust securities in the period from the time the alleged misrepresentation was made to the time BDO completed the work related to 2013 audit.

---

[274] *ATSI*, 493 F.3d at 106.

[275] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

The same analysis and result applies to the second alleged misstatement. The second statement is the functional equivalent of those addressed in the prior section of this opinion concerning BDO's unqualified audit opinions and the representation that AmTrust's financial statements were presented in accordance with GAAP. The Court already has gone through the analysis and determined that those statements, following completion of the audit work, are not actionable. And while it may be true that prior to that time, AmTrust's stock price was artificially inflated due to the concealment of certain facts, plaintiffs allege no loss causation in that window of time. Thus, plaintiffs fail to state a claim under the Exchange Act against defendant BDO.

The Court holds that plaintiffs fail to state a claim under Section 11 of the Securities Act and Section 10(b) of the Exchange Act against defendant BDO. Accordingly, BDO's motion to dismiss is granted.

## Conclusion

For the foregoing reasons, the Court grants the AmTrust, Underwriters, and BDO defendants' motions to dismiss in their entirety.

SO ORDERED.

Dated:       September 9, 2019

Lewis A. Kaplan.
United States District Judge